JOHN L. BURRIS (SBN #69888)
LAW OFFICES OF JOHN L. BURRIS
7677 Oakport Street, Suite 1120
Oakland, California  94621
(510) 839-5200; FAX (510) 839-3882
Email: john.burris@johnburrislaw.com

JAMES B. CHANIN (SBN# 76043)
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California  94705
(510) 848-4752; FAX: (510) 848-5819
Email: jbcofc@aol.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF JERRY A. AMARO III; GERALDINE MONTOYA; STEPHANIE MONTOYA;<br><br>   Plaintiffs,<br><br>vs.<br><br><br>CITY OF OAKLAND; RICHARD WORD; EDWARD POULSON; R. HOLMGREN; S. NOWAK; M. BATTLE; E. KARSSEBOOM; C. BUNN; M. PATTERSON; individually and in their capacities as members of the CITY OF OAKLAND Police Department; DOES 1-100, inclusive,<br><br>   Defendants. | CASE NO:  C09-01019 WHA<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANT EDWARD POULSON**<br><br>**Date:  June 4, 2009**<br>**Time: 8:00 a.m.**<br>**Courtroom: 9**<br>**The Hon. William H. Alsup** |

1

**TABLE OF CONTENTS**

I.  INTRODUCTION                                                          1

II.  STATEMENT OF THE FACTS                                              1

III.  ARGUMENT                                                           9

A.  STANDARDS APPLICABLE TO A MOTION
TO DISMISS UNDER F.R.CIV.P. 12(B)(6)                                     9

B.  THE PLAINTIFFS' COMPLAINT ADEQUATELY ALLEGES THAT
THE ONE YEAR STATUTE OF LIMITATION ON PLAINTIFFS'
42 U.S.C. SECTION 1983 CLAIMS WAS TOLLED BASED ON THE
DOCTRINE OF EQUITABLE ESTOPPEL BECAUSE OF
THE DEFENDANTS' FRAUDULENT CONCEALMENT OF
THE USE OF EXCESSIVE FORCE ON MR. AMARO                                  10

IV.  CONCLUSION                                                          15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

## TABLE OF AUTHORITIES

3

**CASES**

4

*Battuello v. Battuello* (1998) 64 Cal.App.4th 842                                    12

5

*Bernson v. Browning-Ferris Industries* (1994) 7 Cal. 4th 926             11,13,14

6

*Conley v. Gibson,* 355 U.S. 41 (1957)                                                   9

7

*Conmar Corp. v. Mitsui & Co*., 858 F.2d 499 (9th Cir. 1988)              4,11

8

*Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins* (2005)
132 Cal. App. 4th 1076                                                                      12

9

*In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979)   4,10,11

10

*Lukovsky v. City & County of San Francisco*, 535 F.3d 1044 (9th Cir. 2009)   13

11

*Naton v. Bank of California*, 649 F.2d 691 (9th Cir. 1981)                  10

12

*Rhodes v. Guiberson  Oil Tools Division*, 927 F.2d 876 (5th Cir. 1991)   10

13

*TwoRivers v. Lewis,* 174 F.3d 987 (9th Cir. 1999)                            9

14

*United Klans of America v. McGovern*, 621 F.2d 152 (5th Cir. 1980)        4

15

*Young v. United States*, 535 U.S. 43 (2002)                                 10,13

16

**STATUTES**

17

42 U.S.C. Section 1983                                                                 1

18

F.R.Civ.P. 12(b)(6)                                                                   9

19

F.R.Civ.P. 56                                                                         11

20

21

22

23

24

## I.  INTRODUCTION

The doctrine of equitable estoppel is intended to prevent injustice that would result from denying Plaintiffs a remedy for their damages based on the statute of limitations where the Defendants fraudulently concealed the truth of their liability from the Plaintiffs within the limitations period. The facts of the instant case scream out for the application of the doctrine of equitable estoppel due to Defendants' fraudulent concealment as described more fully below.

The Plaintiffs have alleged that the moving party, Defendant Edward Poulson, and other members of the City of Oakland Police Department, fraudulently concealed that Jerry Amaro was beaten during the course of his arrest on March 23, 2000.  Mr. Amaro later died on April 21, 2000 from injuries he sustained during this arrest, including five broken ribs, a lacerated lung and other internal injuries.  Defendant Poulson is reportedly on administrative leave from the Oakland Police Department due to an FBI investigation into his conduct during and following this incident.

Despite evidence that Defendant Poulson and/or other members of the Oakland Police Department subjected Mr. Amaro to excessive force during this arrest and deliberately conspired to conceal the truth of how Mr. Amaro suffered his serious injuries, Defendant Poulson is now asking this Court to reward his interference in the homicide investigation of Mr. Amaro's death and his fraudulent concealment of the truth by dismissing the Plaintiffs' Complaint before Plaintiffs can conduct any discovery as to the true facts and circumstances that led to Mr. Amaro's death.  The dismissal of this lawsuit under these circumstances, particularly before the Plaintiffs are given any opportunity to conduct discovery, would be a travesty of justice.

## II.  STATEMENT OF THE FACTS

In their Complaint for Damages against the City of Oakland and individual members of the Oakland Police Department under 42 U.S.C. Section 1983 (hereinafter, Complaint), Plaintiffs

allege, *inter alia,* that on March 23, 2000, Jerry A. Amaro III was arrested by members of the City of Oakland Police Department, including by the moving party, Defendant Edward Poulson. (Complaint, para. 1-23).  Plaintiffs allege that Mr. Amaro was subjected to excessive force during the arrest which included, but was not limited to, being kicked in the torso and ribcage while he was on the ground. (Complaint, para. 24).  Plaintiffs further allege that officers involved in the arrest were aware that Mr. Amaro had been subjected to excessive force, but failed to intervene to prevent or stop the use of excessive force on Mr. Amaro. (Complaint, para. 25).

Plaintiffs allege that the use of excessive force on Mr. Amaro was so extreme that he suffered severe injuries, including, but not limited to, five fractured ribs, the laceration of his left lung and other injuries.  (Complaint, para. 26).  Despite these severe injuries, Plaintiffs allege that the Defendants failed to obtain medical treatment for Mr. Amaro and, instead, transported him to jail. *Id.*

In their Complaint, Plaintiffs further allege that Defendant Poulson was a Lieutenant in the City of Oakland Police Department at the time of this incident and was the highest ranking member of the department present during the incident.  (Complaint, para. 27).  Subsequent to this incident, Plaintiffs allege that Defendant Poulson was promoted to the rank of Captain and also held a high ranking assignment within the Oakland Police Department's Internal Affairs division where he was responsible for investigating complaints of misconduct against members of the Oakland Police Department.  *Id*.

Plaintiffs allege that the  individual Defendants, including Defendant Poulson, conspired with one another to lie about and conceal the use of excessive force on Mr. Amaro and that they continued to lie about and conceal the true facts during investigations conducted into the incident by the Oakland Police Department after Mr. Amaro's death on April 21, 2000.  (Complaint, para. 28-30).

As a result of the conspiracy by the Defendants, including Defendant Poulson, to lie about and conceal the true facts concerning the use of excessive force on Mr. Amaro, Plaintiffs allege that they were prevented from knowing the true facts concerning the excessive force used on Mr. Amaro within the limitations period despite exercising due diligence and did not learn about the cover-up of the truth or Defendant Poulson's personal involvement until the publication of news reports in January 2009. (Complaint, para. 31). In those reports, Plaintiffs learned that Defendant Poulson had been suspended by the City of Oakland Police Department in January 2009 because of an FBI investigation in which it was alleged that he kicked the decedent during the subject incident and directed his subordinates to lie about it. *Id.*[1]

Plaintiffs further allege that prior to this disclosure in January 2009, they had no ability to obtain the true facts of this incident and, in fact, despite their due diligence, could not have learned about the true facts due to 1) the intentional concealment of the true facts by the individual Defendants; 2) the fact that police officer personnel and investigations are confidential under California law; and 3) Plaintiffs had been denied access to the police report of the incident. (Complaint, para. 32-34).

Plaintiffs' contention that they are entitled to invoke the doctrine of equitable estoppel based on Defendants' fraudulent concealment is further supported by the evidence of the cover-up of this incident which is described in detail in a May 10, 2009, San Francisco Chronicle article about the Amaro incident. A true and accurate copy of that article is attached to the declaration of Plaintiffs' counsel and incorporated herein by reference as Exhibit 2.[2]

---

[1] A true and accurate copy of a January 29, 2009 Oakland Tribune Article discussing the Amaro case is attached and incorporated by reference as Exhibit 1 to the Declaration of Plaintiff's Counsel.

[2] While Defendant Poulson criticizes Plaintiffs' reliance on news articles to support their contention that equitable estoppel should be applied in this case, Courts, including the Ninth

**Plaint. Oppos. To Def. Poulson's Mot. To Dismiss**

**Estate of Amaro v. City of Oakland, Case No. C09-01019 WHA**

3

In the most recent San Francisco Chronicle article, it was reported that only after Defendant Poulson's promotion to Captain and assignment to head the Internal Affairs division of the OPD some eight years after Mr. Amaro's death, did new allegations concerning the incident come to light which led to the suspension of Defendant Poulson and the opening of an FBI investigation into the underlying incident in 2009.  (Chanin decl., Ex. 2, p. 1).

As noted in the article, the San Francisco Chronicle obtained "investigative documents" in the case which raise questions about not only what happened during Mr. Amaro's arrest, but whether officials in the OPD and Alameda County District Attorney's Office short-circuited the criminal probe into what happened during the incident.  (Chanin decl., Ex. 2, p. 1).

Specifically, the article states that Mr. Amaro was arrested during a drug sting supervised by Defendant Poulson and that the OPD reports of the incident contain no mention of any force being used on Mr. Amaro.  *Id.* at page 2.  After Mr. Amaro's death on April 21, 2000, the OPD commenced a homicide investigation during which Defendant Poulson was reportedly questioned about the arrest of Mr. Amaro.  *Id.*  According to the article, Defendant Poulson denied that Mr. Amaro had been subjected to the use of force during his arrest.  *Id.*

---

Circuit, have considered press reports in determining whether to apply the doctrine of equitable estoppel. See, e.g., *Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 504 (9th Cir. 1988)(Press articles considered, but not determinative of constructive notice);  *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1170-71 (5th Cir. 1979)(Press articles considered on issue of fraudulent concealment, but triable issues of fact precluded summary judgment for the defense); *United Klans of America v. McGovern*, 621 F.2d 152, 154-55 (5th Cir. 1980)(Equitable estoppel did not apply; press reports, among other widely reported information, put plaintiffs on notice of their claims).  In this case, it was not until the January 2009 press articles that Plaintiffs herein were first on notice of the police officers' conspiracy to cover-up of the use of excessive force on the decedent, Defendant Poulson's alleged personal involvement in the assault on Mr. Amaro, the City Attorney's report to the City Council in 2005 and the FBI investigation that led to Defendant Poulson's placement on administrative leave.

**Plaint. Oppos. To Def. Poulson's Mot. To Dismiss**
**Estate of Amaro v. City of Oakland, Case No. C09-01019 WHA**

4

Despite Defendant Poulson's denial that force was used on Mr. Amaro during the arrest, the article notes that the homicide investigator, Sgt. Gus Galindo, found a woman in the neighborhood who said she saw two undercover officers punch Mr. Amaro in the back as he struggled with a third officer.  *Id.*  The article further notes that while nine OPD officers were interviewed by homicide investigators on April 25, 2000, all nine of the officers said they had not beaten Mr. Amaro and did not see anyone hit him.  *Id.*

The San Francisco Chronicle reported that Lt. Paul Berlin, the head of the homicide unit, received a tip on the following day that the "whole truth" of what happened during the incident was being held back by the officers.  *Id.* at page 3.  The article further notes that Sgt. Galindo briefed then Chief Richard Word, who is also a Defendant in this case, and that Chief Word directed him to turn the investigation over to OPD Internal Affairs.  *Id.*   The article notes that this decision was critical because, unlike in criminal interviews, information learned in Internal Affairs probes often cannot be used in criminal court under state law.  This decision, the San Francisco Chronicle noted, effectively ended the criminal investigation into Mr. Amaro's death and ensured that the officers would not be criminally prosecuted for his death.  *Id.*

The San Francisco Chronicle went on to report that its "review of the documents raises deeper questions about what police officials and prosecutors knew at the time Word met with Galindo and the case was transferred to internal affairs." *Id.*    Specifically, the article reported that prior to the "whole truth" tip received by Lt. Paul Berlin in the homicide unit, Alameda County District Attorney, Tom Orloff, had decided no crime had been committed by the officers. However, according to the San Francisco Chronicle, Sgt. Galindo's log indicates that Lt. Berlin, who had received the "whole truth" tip, briefed District Attorney Orloff three hours after Sgt. Galindo reported that Chief Word had ordered the homicide unit off the case.  *Id.*  Although Mr. Orloff reportedly told the San Francisco Chronicle that he had no memory of the case, he did

say, "Obviously, I wasn't told certain things.  If I had been told, I would say, 'You've got to get to the bottom of this.'  There would have been more follow-up."  *Id.*

The San Francisco Chronicle reported that Lt. Berlin declined in an interview to reveal what he told District Attorney Orloff, but said he had been simply "following orders" when the case was transferred out of homicide to Internal Affairs.  *Id.* at pages 3-4.

The article also reported that Sgt. Galindo had not totally relinquished the case and advised the District Attorney's office about the account of a second witness who reported that Defendant Poulson's officers had "bum-rushed" and "whupped" Mr. Amaro who had never resisted.  *Id.* at 4.  According to the article, Sgt. Galindo's final entry in his homicide investigation log reflected that on May 10, 2000, the District Attorney's office declined to prosecute the case.  *Id.*

The San Francisco Chronicle article also reported that after the case was transferred to Internal Affairs from homicide, Defendant Word issued an order that the arresting officers not be disciplined for lying if they changed their initial accounts.  *Id.*  When interviewed, the Chronicle noted that Defendant Word claimed he had no memory of giving such an order, even though the newspaper apparently obtained a report that had been prepared by the Oakland City Attorney's office about the incident which mentioned such an order being given by him.  *Id.*

According to the San Francisco Chronicle article, Defendant Holmgren, one of the nine officers involved in the incident, did change his initial account and claimed that he heard and felt blows to Mr. Amaro's back while he struggled with him, but claimed he did not know who administered the blows to Mr. Amaro.  *Id.*  The article further notes that two other officers, Defendants Bunn and Patterson, told internal affairs about an "odd" encounter with Defendant Poulson when he summoned them to a secluded part of a police parking lot and tried to influence their accounts of the incident after Lt. Berlin received the "whole truth" tip on April 26, 2000.

According to the newspaper, the meeting ended when another OPD supervisor, Sgt. Mike Yoell arrived and warned Defendant Poulson, "This isn't good – this looks like a police cover-up."

The newspaper also reported that Defendant Poulson was told by Sgt. Yoell that there were rumors that Defendant Poulson had assaulted Mr. Amaro himself, but that Defendant Poulson denied this occurred. *Id.* at pages 4-5. The article also noted that several days after Defendant Poulson gave his account to Internal Affairs, the OPD received an anonymous letter stating that before the arresting officers were interviewed by the homicide investigator, Defendant Poulson met with them at the Police Officers Association office, told them he was seeking a promotion and that any accusation against him would be "going against a captain." *Id.*

Although Defendant Poulson's supervisor, Captain Ron Davis, reportedly concluded that Defendant Poulson had made a "blatant attempt" to influence officers' accounts of the incident and should have been demoted as a result of his conduct, then Deputy Chief Peter Dunbar recommended only a 10 day suspension and no demotion. Id. The article reported that Chief Word agreed with Deputy Chief Dunbar's recommendation and no one else was disciplined as a result of the incident involving Mr. Amaro. *Id.*

The San Francisco Chronicle also reported that the OPD Internal Affairs investigation of this incident was "blasted" in a 2001 report from a private attorney that had been commissioned by the Oakland City Attorney's office to defend it if Defendant Poulson attempted to appeal his suspension. *Id.* In that report, the newspaper noted that the investigator referred to the Internal Affairs investigation as a "softball" and that she was "mystified" that Defendant Word directed that discrepancies between what the officers told Sgt. Galindo's homicide investigation and what they told Internal Affairs not be held against them. *Id.* The investigator also noted that the Internal Affairs investigators' questioning of the officers largely consisted of "offering excuses to the officers which they then (adopted)." *Id.*

**Plaint. Oppos. To Def. Poulson's Mot. To Dismiss**
**Estate of Amaro v. City of Oakland, Case No. C09-01019 WHA**

7

Despite the fact that this incident occurred in 2000, the newspaper reported that Oakland City Attorney, John Russo, sent a confidential memo in 2005 to then Mayor, Jerry Brown, and the City Council, that reviewed the department's handling of the case.  Citing the report commissioned by the City Attorney's office in 2001, it is reported that Mr. Russo called the OPD investigation "procedurally improper and substantively inadequate."  *Id*. at 5.  No explanation is provided in the San Francisco Chronicle article about why the City Attorney sent the memo to the Mayor and City Council about this incident in 2005.[3]

Later, the newspaper reported that after Chief Wayne Tucker decided to appoint Defendant Poulson to run Internal Affairs in late 2008, "someone within the Police Department then contacted the FBI, accusing Poulson himself of having kicked Amaro on the ground and then ordering officers to lie, according to authorities with knowledge of the case." *Id.*  The article also reported that Defendant Poulson is on paid administrative leave pending the outcome of the FBI investigation and that he declined to comment for the Chronicle story.  *Id.*

Absent the press reports in 2009, Plaintiffs would have had no access to, or even constructive knowledge of 1) the conspiracy by the Defendants to cover-up the use of excessive force on Mr. Amaro; 2) the alleged personal involvement of Defendant Poulson in the kicking of Mr. Amaro while he was on the ground and not resisting; 3) the ratification of the cover-up by the chain of command, including Chief Word;  or 4) the FBI investigation of Defendant Poulson and his placement on administrative leave in 2009.  It is disingenuous for Defendant Poulson to

---

[3] Despite this alleged memo and apparent knowledge of the Oakland City Attorney's office of the alleged cover-up of the Amaro incident, the Oakland City Attorney's Office has filed an Answer on behalf of the City and the other individual Defendants in this case in which they deny virtually all of the allegations of the Plaintiffs' Complaint and/or claim a lack of sufficient knowledge of the claims to admit or deny them. These allegations in the Answer appear to lack any merit if the San Francisco Chronicle's report about the investigation commissioned by the City Attorney's Office is true.

1  now claim that Plaintiffs had all the facts they needed to file suit in 2000 in light of the

2  conspiracy of the Defendants to conceal the truth from not only the Plaintiffs, but from OPD

3  homicide investigators and the Alameda County District Attorney's office.  To reward the

4  Defendants' conspiracy to conceal the truth of what happened to Mr. Amaro by dismissing

5  Plaintiffs' lawsuit before they are given any opportunity to conduct discovery to determine

6  whether the press accounts are true, would be inequitable, if not unconscionable.

**III.  ARGUMENT**

**A.  STANDARDS APPLICABLE TO A MOTION TO DISMISS UNDER F.R.CIV.P. 12(B)(6)**

A motion to dismiss under F.R.C.P. 12(b)(6) tests for legal sufficiency of the claims

alleged in the complaint. A complaint should not be dismissed "unless it appears beyond doubt

that the Plaintiffs can prove no set of facts in support of their claims which would entitle them to

relief.  *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

A motion to dismiss under F.R.Civ.P. 12(b)(6) on statute of limitations grounds can be

granted "only if the assertions of the complaint, read with the required liberality, would not

permit the plaintiff to prove that the statute was tolled.'" *TwoRivers v. Lewis,* 174 F.3d 987, 991

(9th Cir. 1999).  In the instant case, as shown more fully below, Defendant Poulson has failed to

establish as a matter of law that Plaintiffs will be unable to prove that the statute of limitations

was tolled on the basis of equitable estoppel due to fraudulent concealment by the Defendants.

While Plaintiffs believe that their Complaint provides a sufficient basis on which to deny

Defendant Poulson's motion to dismiss based on the doctrine of equitable estoppel, Plaintiffs

respectfully request leave to amend in the event that the Court grants the motion.

**B. THE PLAINTIFFS' COMPLAINT ADEQUATELY ALLEGES THAT
THE ONE YEAR STATUTE OF LIMITATION ON PLAINTIFFS' 42 U.S.C.
SECTION 1983 CLAIMS WAS TOLLED BASED ON THE DOCTRINE OF
EQUITABLE ESTOPPEL BECAUSE OF THE DEFENDANTS' FRAUDULENT
CONCEALMENT OF THE USE OF EXCESSIVE FORCE ON MR. AMARO**

In *Young v. United States*, 535 U.S. 43, 49-50 (2002), the Supreme Court noted that "[i]t is hornbook law that limitations periods are customarily subject to equitable tolling unless tolling would be inconsistent with the text of the relevant statute. Congress must be presumed to draft limitations periods in light of this background principle."  The Court further noted in *Young* that:

> "This Court has permitted equitable tolling in situations "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory  period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin,* 498 U.S. at 96 (footnotes omitted)."

Equitable estoppel focuses primarily on the actions taken by the Defendants in preventing the Plaintiffs from filing suit, whereas equitable tolling focuses on the Plaintiffs' excusable ignorance of the limitations period and on lack of prejudice to the Defendants. *See Naton v. Bank of California*, 649 F.2d 691, 695-96 (9th Cir. 1981).

A finding of equitable estoppel rests on the consideration of a non-exhaustive list of factors, including: (1) the plaintiff's actual and reasonable reliance on the defendant's conduct or representations, (2) evidence of improper purpose on the part of the defendant, or of the defendant's actual or constructive knowledge of the deceptive nature of its conduct, and (3) the extent to which the purposes of the limitations period have been satisfied. *See id*. Equitable estoppel may apply where the Defendant misrepresents or conceals facts necessary to support the Plaintiffs' claims. *See, e.g., In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1170-71 (5th Cir. 1979); *Rhodes v. Guiberson  Oil Tools Division*, 927 F.2d 876, 878-79 (5th Cir. 1991).

Where there are triable issues of disputed fact on the question of whether equitable estoppel tolls the statute of limitations due to the defendants' fraudulent concealment, granting

summary judgment under F.R.Civ.P. 56 is reversible error.  *See, e.g.*, *Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499 (9th Cir. 1998); *In re Beef Industry Antitrust Litigation, supra.*

As Defendant Poulson notes, the Court may consider California law in determining whether to apply tolling principals so long as the law is not in conflict with federal law.  Under California law, equitable estoppel has been held by the California Supreme Court to operate to toll the statute of limitations where an otherwise diligent plaintiff has been unable to discover the existence of a cause of action due to the defendants' fraudulent concealment.  *Bernson v. Browning-Ferris Industries* (1994) 7 Cal. 4th 926, 931-32.

In *Bernson*, a libelous document was circulated, but it failed to identify the author.  The plaintiff sued after the statute of limitations had expired, arguing equitable estoppel because of the fraudulent concealment of the document's author within the limitations period.  In reversing summary judgment for the defendant, the Court queried whether a defendant who actively conceals his identity and involvement in the action that resulted in the plaintiff's damages should be estopped from claiming the bar of the statute of limitations.  The Court questioned whether allowing the defendant to claim the bar of the statute of limitations would be akin to a allowing an anonymous assailant to escape liability for an assault where the victim is unable to identify the assailant within the limitations period.  *Id.* In determining that the defendants should be equitably estopped from claiming the bar of the statute of limitations in such cases, the Court noted,

> "It has long been established that the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." (*citation omitted*).
> Like the discovery rule, the rule of fraudulent concealment is an equitable principle designed to effect substantial justice between the parties; its rationale "is that the culpable defendant should be estopped from profiting by his own wrong to the extent that it hindered an 'otherwise diligent' plaintiff in discovering his cause of action."

1    Citations omitted).

2    *Id.* at 931.

3    In *Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins* (2005) 132 Cal. App. 4th

4    1076, 1089-90, the Court there also reversed the dismissal of a homeowner's lawsuit on statute

5    of limitations grounds based on the doctrine of equitable estoppel due to misrepresentations

6    made by an insurance carrier.  In that case, the evidence showed that the insurance company

7    made misrepresentations as to whether the plaintiff's damages exceeded the policy deductible

8    and denied the homeowner's earthquake policy claim.  In reversing the demurrer to the

9    Complaint, the Court in *Doheny* noted:

10       "Equitable estoppel differs from equitable tolling in distinct and important ways.  They
         each arise under different circumstances, and have different rationales and different
11       predicates. (*Battuello v. Battuello* (1998) 64 Cal.App.4th 842, 847–848 [75 Cal. Rptr.
         2d 548 ].) Equitable estoppel does not "extend" a limitations period 'but rather comes
12       into play only after the limitations period has run and addresses itself to the
         circumstances in which a party will be estopped from asserting the statute of
13       limitations as a defense to an admittedly untimely action because his conduct has
         induced another into forbearing suit within the applicable limitations period.' " (*Id.* at
14       p. 847.) Unlike the doctrine of equitable tolling, which takes its life from the statute
         of limitations itself, the doctrine of equitable estoppel " 'takes its life … from the
15       equitable principle that no man will be permitted to profit from his own wrongdoing
         in a court of justice.' " (*Id.* at pp. 847–848.)

16    *Id.*

17    Like the anonymous assailant in the analogy posited by the California Supreme Court in

18    *Bernson, supra,* who tries to escape liability for committing an assault by concealing his identity

19    within the limitations period, Defendant Poulson is attempting to profit from his own

20    wrongdoing by asking this Court to dismiss the Plaintiffs' Complaint on the grounds of the

21    statute of limitations where he and other members of the City of Oakland Police Department

22

23                        **Plaint. Oppos. To Def. Poulson's Mot. To Dismiss**
24                      **Estate of Amaro v. City of Oakland, Case No. C09-01019 WHA**
                                              12

conspired to fraudulently conceal the truth from the Plaintiff, homicide investigators and even the Alameda County District Attorney's Office.

Unlike *Lukovsky v. City & County of San Francisco*, 535 F.3d 1044, 1051-52 (9th Cir. 2008), where the Court found that the plaintiffs not only knew of the injury that gave rise to their claims, but who caused the injury, Defendant Poulson has failed to establish as a matter of law that equitable estoppel does not apply where the most recent press report of the incident on May 10, 2009, describes in detail the officers' intentional lies about the cause of the injuries to Mr. Amaro, the concealment of the personal involvement of Defendant Poulson in kicking the decedent and the ratification of the fraudulent concealment of the truth by the Chief of Police.

While the City of Oakland Police Department, the City of Oakland City Attorney's Office and the San Francisco Chronicle have all had access to the documents establishing the existence of a conspiracy to cover-up the truth about Mr. Amaro's death as set forth in the San Francisco Chronicle article of May 10, 2009, Defendant Poulson's motion seeks to prevent the Plaintiffs from ever having access to the evidence of this conspiracy through the discovery process.

Denying equitable estoppel to the Plaintiffs under these circumstances, particularly before Plaintiffs are given any opportunity to conduct discovery, would reward the Defendants for their conspiracy to conceal the truth about their use of force on Mr. Amaro and would result in a travesty of justice.  This is particularly true where Defendant Poulson has failed to rebut the truth of the Plaintiffs' allegations as a matter of law and where discovery is likely to support Plaintiffs' claims on the merits and well as their invocation of the doctrine of equitable estoppel

In addition, it appears that Defendant Poulson has confused the "delayed discovery rule,"

where the onset of the limitations period is delayed until a plaintiff knows or has reason to know of the injury which is the basis of the action, with the fraudulent concealment doctrine.  The latter, as stated above, focuses on the actions of the defendant calculated to prevent the plaintiff from filing suit within the limitations period, even though the plaintiff is already aware of the injury that is the basis of the action. *See, e.g.*, *Bernson, supra,* 7 Cal. 4th at 931-32.

Therefore, the fact that Plaintiff Geraldine Montoya may have been generally aware of the injury that is the basis of the action in 2000 when she filed a Tort Claim with the City of Oakland, this fact alone does not prevent the application of equitable estoppel.[4]  This is particularly true where there is evidence that Defendant Poulson and the other officers involved in the arrest of Mr. Amaro deliberately conspired to conceal the use of force on Mr. Amaro that led to his death and where Plaintiffs had no ability to discover the truth despite due diligence because of the Defendants' lies, the refusal of the OPD to provide the Plaintiffs with any reports concerning the incident within the statute of limitations and California law which prevented Plaintiffs from having any access to the OPD Internal Affairs and Homicide investigations.

Defendant Poulson's argument that Plaintiffs "already knew (or had reason to know of) all facts required to file a timely complaint" (Def. Memo. 8:16-23) is astounding when considered in light of the allegations contained in the May 10, 2009, San Francisco Chronicle article which clearly show that not only did the Plaintiffs not know of all facts to file a timely

---

[4] The Tort Claim referred to by Defendant Poulson in his motion that was filed by Geraldine Montoya is alleged in very general and conclusory terms because Defendants' fraudulent concealment prevented Plaintiffs from having knowledge of the specific acts that caused Mr. Amaro's death until 2009.  Moreover, Defendant Poulson fails to explain how this Tort Claim would bar Plaintiff Stephanie Montoya's claims at all when 1) she was not a party to the Tort Claim and, 2) where she was a minor dependent upon the decedent at the time of the subject incident as alleged in the Complaint. (Complaint, para. 5).

complaint, but that the truth of what occurred during this incident was concealed by Defendant Poulson and other officers from OPD homicide investigators as well as the Alameda County District Attorney's office .

Plaintiffs have alleged facts in their Complaint that, if proved, would have led reasonable persons to believe that they would not have been able to bring a claim for relief until after they learned about the conspiracy to cover up the use of force on Mr. Amaro in January 2009. Specifically, Plaintiffs have alleged, and presented evidence, showing that Defendant Poulson and other officers involved in the subject incident intentionally conspired to cover up the true facts concerning the use of force on Mr. Amaro.  The evidence cited in the May 10, 2009 San Francisco Chronicle article also indicates that former Oakland Police Chief, Defendant Richard Word, ratified the cover-up by declining to discipline the officers for giving false accounts of the incident and by imposing a mere 10 day suspension on Defendant Poulson for his outrageous conduct.

None of the cases cited by Defendants establish that Plaintiffs' claims are barred by the statute of limitations where there is ample evidence of a conspiracy to fraudulently conceal both the facts about, and perpetrators of, a homicide by numerous members of the Oakland Police Department, including the moving party.

### IV. CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court deny the motion. Alternatively, Plaintiffs request leave to amend if the Court grants the motion for any reason.

Dated: May 14, 2009
_____/S/_____          _____/S/_____
John L. Burris                                              James B. Chanin
Attorney for Plaintiffs                                  Attorney for Plaintiffs

**Plaint. Oppos. To Def. Poulson's Mot. To Dismiss**
**Estate of Amaro v. City of Oakland, Case No. C09-01019 WHA**
15