1  JOHN L. BURRIS (SBN #69888)
   LAW OFFICES OF JOHN L. BURRIS
2  7677 Oakport Street, Suite 1120
   Oakland, California  94621
3  (510) 839-5200; FAX (510) 839-3882
   Email: john.burris@johnburrislaw.com
4
   JAMES B. CHANIN (SBN# 76043)
5  Law Offices of James B. Chanin
   3050 Shattuck Avenue
6  Berkeley, California  94705
   (510) 848-4752; FAX: (510) 848-5819
7  Email: jbcofc@aol.com

8  Attorneys for Plaintiffs

9
                    UNITED STATES DISTRICT COURT
10
                    NORTHERN DISTRICT OF CALIFORNIA
11

12  THE ESTATE OF JERRY A. AMARO III;    )   CASE NO:  C09-01019 WHA
    GERALDINE MONTOYA; STEPHANIE         )
13  MONTOYA;                             )   **DECLARATION OF PLAINTIFF,**
                                         )   **GERALDINE MONTOYA, SUBMITTED**
14       Plaintiffs,                     )   **PURSUANT TO COURT'S ORDER AT**
                                         )   **HEARING ON JUNE 4, 2009**
15  vs.                                  )
                                         )   **Hearing Date:  June 4, 2009**
16                                       )   **Time: 8:00 a.m.**
                                         )   **Courtroom: 9**
17  CITY OF OAKLAND; RICHARD WORD;       )   **The Hon. William H. Alsup**
    EDWARD POULSON; R. HOLMGREN; S.      )
18  NOWAK; M. BATTLE; E. KARSSEBOOM;     )
    C. BUNN; M. PATTERSON; individually and )
19  in their capacities as members of the CITY OF )
    OAKLAND Police Department; DOES 1-100, )
20  inclusive,                           )
                                         )
21       Defendants.                     )
                                         )
22

23
              **Decl. of Plaint. G. Montoya Submitted Per Court's Order 6/4/09**
24            **Estate of Amaro v. City of Oakland, Case No. C09-01019 WHA**
                                        1

I, GERALDINE MONTOYA, DECLARE:

1. I am the mother of the decedent, Jerry A. Amaro III, and am a plaintiff in the within action.

2. I have personal knowledge of the matters stated herein and would testify to the same if called to do so in Court, except as to those matters stated upon information and belief, and as to those matters, I am informed and believe them to be true and correct.

3. On the afternoon of April 21, 2000, I was at my home, located at 9331 Coral Road in Oakland, California. Sgt. Galindo of the Oakland Police Department and another officer came to my home and advised me that my son had died earlier that day. Prior to hearing this from Sgt. Galindo, I was not aware of my son's death. I was standing outside near my front gate when I spoke to the officers. My husband, Louis Montoya, was also present when the police were at my home.

4. After learning from Sgt. Galindo that my son had died, I became hysterical and started to cry and scream in anguish.

5. Sgt. Galindo informed me that he was conducting a homicide investigation concerning the circumstances surrounding my son's death. He told me that he believed that my son was found dead in the street and that he had been killed as a result of gang or drug activity.

6. I told Sgt. Galindo that my son had told me that he had been beaten during a recent arrest by the Oakland Police Department and I began to raise my voice because he did not appear to want to hear what I was saying about the possible involvement of the OPD in the death of my son. As a result, Sgt. Galindo demanded that I get into his car and told me to stop talking about the police involvement in my son's death. He continued to assert that my son had been killed as

**Decl. of Plaint. G. Montoya Submitted Per Court's Order 6/4/09**
**Estate of Amaro v. City of Oakland, Case No. C09-01019 WHA**

2

a result of gang activity or drugs rather than as a result of a beating by the Oakland Police. I am informed and believe and thereon state that some, but not all, of my conversation with Sgt. Galindo may have been tape recorded. However, I have never been provided with a copy of my tape recorded statement by the OPD.

7. Sgt. Galindo also spoke to my husband, Louis Montoya, while he was at my home on April 21, 2000. During his conversation with my husband, he also argued that my son had been killed a result of gang involvement or drugs. My husband also told Sgt. Galindo that my son had claimed he had been beaten by the police during a recent arrest, but Sgt. Galindo continued to argue that my son's death was due to gang involvement or drugs.

8. On or about April 22, 2000, I spoke by telephone with Sgt. Galindo again. During my phone conversation with Sgt. Galindo, I asked him to authorize the release of my son's body from the morgue and requested that he provide me with a copy of the police reports concerning my son. Sgt. Galindo told me he would not authorize the release of my son's body from the morgue until after an autopsy had been conducted and further told me that he would not provide me with any reports concerning my son because the matter was still under investigation.

9. Within a week after my son's death on April 21, 2000, I went to the Oakland Police Administration building with my niece, Desiree Fernandez. At that time, we requested a copy of the police reports concerning my son's death at the records division. I was told that we could not obtain any copies of the reports because the matter was still under investigation. I then requested the opportunity to speak with Sgt. Galindo. I was told that I would have to go to the Homicide unit to speak to Sgt. Galindo. When I went to the Homicide unit, I was told that Sgt. Galindo

1  was unavailable to speak to me.  I left my name and phone number with the person I spoke to in
2  the Homicide unit and requested that Sgt. Galindo call me.

3      10.  Approximately a month and a half after my son died, Sgt. Galindo finally did call my
4  home.  I was unavailable when he called and a relative took a message.  I returned Sgt. Galindo's
5  call a few days later.  At that time, he was very rude and brusque with me.  I asked Sgt. Galindo
6  for a copy of the police reports concerning my son.  His response was words to the effect, "Why
7  do you need the reports?"  I told Sgt. Galindo that I was my son's mother and wanted to find out
8  why he died.  Sgt. Galindo told me he was "too busy" to speak to me and hung up the phone.

9      11.  Concerned about the possibility that my son's death was related to being beaten by
10  members of the Oakland Police Department, I attempted unsuccessfully to hire an attorney to
11  represent me.  Oakland attorneys, Michael Haddad , John Burris and several others, declined to
12  represent me in 2000.  At that time, I had did not have any of the police reports of the incident,
13  had been unable to locate any witnesses who saw my son's arrest, did not have any other
14  evidence corroborating my son's claim that he had been beaten by the police and Sgt. Galindo
15  had claimed that my son had been killed as a result of gang activity or drugs when I spoke to him
16  the day my son died.

17      12.  I did my best to try and obtain evidence showing that my son had been beaten by
18  OPD officers during his arrest within the year of his death.  This included posting flyers in the
19  neighborhood and by making inquiries by word of mouth.  I never received any response to my
20  flyers and was unable to locate any witnesses to the arrest of my son.

**Decl. of Plaint. G. Montoya Submitted Per Court's Order 6/4/09**
**Estate of Amaro v. City of Oakland, Case No. C09-01019 WHA**
4

1  13. In order to preserve my right to bring a claim under State law while I continued to try
2  and locate an attorney to help me, I filed a Tort Claim with the City of Oakland in pro per. I do
3  not recall ever receiving any formal rejection of this Tort Claim from the City of Oakland.

4  14. I was unable to identify any of the officers involved in the incident at the time I filed
5  the Tort Claim and the only information I had at the time the Tort Claim was filed was the
6  statement of my son that he had been beaten by the police during his arrest. I filed the Tort
7  Claim to preserve the deadline under State law and hoped that I would be able to find some
8  witnesses or other evidence to corroborate my son's claim that could be used to file a lawsuit
9  after the Tort Claim was filed.

10  15. As a result, I diligently continued my efforts to learn about my son's arrest and the
11  use of excessive force by the Oakland Police Department. To that end, I went to the Oakland
12  Police Department on or about November 8, 2000 and submitted a written request for a copy of
13  the police report concerning my son's arrest and his death. My request for a copy of the police
14  reports for these incidents, however, was denied by the Oakland Police Department.

15  16. Since I was unable to locate any witnesses to the use of force on my son during the
16  arrest, the OPD denied my request for a copy of the police report and Sgt. Galindo had alleged
17  that my son was killed because of gang activity or drugs, rather than at the hands of the OPD, I
18  was unable to locate any attorney that would agree to represent me in bringing a lawsuit within
19  the one year statute of limitation.   At no time did Sgt. Galindo ever inform me that my son's
20  death was not gang or drug related and, as a result, it very well could have been related to the
21  police contact with my son on March 23, 2000.

**Decl. of Plaint. G. Montoya Submitted Per Court's Order 6/4/09**
**Estate of Amaro v. City of Oakland, Case No. C09-01019 WHA**
5

17. Given the lack of evidence available to me, including the OPD's specific refusal to provide me with any of its reports concerning the arrest and death of my son and Sgt. Galindo's failure to provide me with information relating to his homicide investigation, and his allegations that my son was killed due to gangs or drugs, I am not aware of anything else I could have done to identify the officers responsible for beating my son within the one year statute of limitations. This is especially true given the recent press reports which indicate that even if I had been successful in obtaining copies of the underlying police reports, those reports allegedly failed to mention that any force was used on my son during the arrest. Additionally, the press reports indicate that none of the nine officers involved in the arrest admitted using any force on my son during that arrest. Moreover, press reports also reveal that 1) Chief Richard Word stated that there would be no punishment given to officers who lied about physical force used on my son; 2) Chief Tucker appointed Defendant Poulson to lead the Internal Affairs Bureau knowing the facts of the 2000 incident; and 3) Defendant Poulson himself was in charge of Internal Affairs prior to the time the 2009 press reports were released. Therefore, I do not know what other efforts I could have made within the one year statute of limitations to obtain evidence corroborating my son's claim that he had been beaten by Oakland Police officers during his arrest. Moreover, I do not believe that any litigation brought within the one year statute of limitations would have revealed the truth about my son's death given the widespread tolerance for untruthfulness in the Oakland Police Department.

18. After my unsuccessful effort to obtain the OPD police reports in November 2000, I was unable to retain an attorney and could not file lawsuit in Court within a year of my son's death.

**Decl. of Plaint. G. Montoya Submitted Per Court's Order 6/4/09**
**Estate of Amaro v. City of Oakland, Case No. C09-01019 WHA**

6

19. I declare under penalty of perjury that the foregoing is true and correct, except as to those matters stated upon information and belief, and as to those matters, I am informed and believe them to be true and correct. Executed this 5th day of June 2009, at Berkeley, California.

_____/S/_____
GERALDINE MONTOYA
Plaintiff