LAW OFFICES OF
## JAMES B. CHANIN
3050 SHATTUCK AVENUE
BERKELEY, CALIFORNIA 94705
(510) 848-4752
FAX (510) 848-5819

November 2, 2009

**Via E-Filing and Chamber Copy**

The Honorable William H. Alsup
Judge of the United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA  94102

      Re:  Estate of Amaro v. City of Oakland, et al., Case No. C 09-0109 WHA

Dear Judge Alsup:

      Pursuant to the Court's Supplemental Order to Order Setting the Initial Case Management, Plaintiffs' counsel are writing to move the Court for an Order compelling Defendant City of Oakland to either produce OPD Lt. Paul Berlin (Ret.) for deposition on a mutually convenient date prior to November 13, 2009, or in the alternative, for an Order compelling Defendant City of Oakland to immediately produce Lt. Berlin's contact information (addresses and phone numbers) so that Plaintiffs may subpoena him for deposition.  As shown more fully below, Lt. Berlin is a critical witness and Plaintiffs' counsel have been unable to resolve this issue informally with counsel for the City of Oakland heretofore.

### BRIEF STATEMENT OF THE FACTS

      This is a 42 U.S.C. Section 1983 action arising from the death of Jerry Amaro on April 21, 2000.  Mr. Amaro died as a result of injuries he sustained during his arrest by Oakland Police officers on March 23, 2000.  These injuries included five broken ribs, a lacerated/punctured lung and complications arising from those injuries.  A May 10, 2009 San Francisco Chronicle article, which succinctly sets forth the facts of the case and the police cover-up of the beating of Mr. Amaro by OPD officers, is attached and incorporated herein by reference as Exhibit 1.  The evidence obtained to date in discovery has verified virtually all of the information contained in the Chronicle article.

      In particular, based on evidence adduced to date in discovery, Lt. Paul Berlin supervised the OPD homicide investigation into the death of Mr. Amaro.  During the course of that investigation, the OPD obtained evidence that Mr. Amaro was beaten by officers during his arrest, yet no mention of the use of force or any resistance by Mr. Amaro was made in any of the police reports prepared by the arresting officers.  In addition, none of the involved officers sought to obtain any medical

1

treatment for Mr. Amaro's serious injuries, despite evidence that he had complained he was injured and wanted to see a doctor at the scene of his arrest.

After all of the officers involved in Mr. Amaro's arrest denied he had been beaten when they were interviewed by OPD homicide investigators on April 25, 2000, there is evidence that Sgt. Michael Reilly and Lt. Yoell, who supervised some of the officers involved in Mr. Amaro's arrest, went to Lt. Berlin the following day and told him that some of the involved officers had told them that the "whole truth" of what occurred during Mr. Amaro's arrest had not come out. There is also evidence that Lt. Poulson, the supervisor of the drug sting operation in which Mr. Amaro was arrested, attempted to influence the statements of at least two of the involved officers. Officer Marcel Patterson, one of the officers involved in Mr. Amaro's arrest, also told investigators that he was contacted by Sgt. Reilly who told him that homicide investigators thought they were a "bunch of liars," that they needed to "come to Jesus" and "fess up" to what happened.

Instead of immediately attempting to re-interview the officers in the homicide investigation, where the officers' voluntary statements could be used against them in a criminal prosecution, the very next day, OPD Police Chief, Richard Word, ordered that the investigation be transferred to Internal Affairs and issued an Order that if officers changed their stories in subsequent Internal Affairs interviews, they would not be disciplined. Under California law, the compelled statements of the officers in the Internal Affairs interviews could not be used against them in the event of any criminal prosecution related to Mr. Amaro's death, effectively ending any possibility that any of the officers would be criminally prosecuted in State Court for Mr. Amaro's death.

Despite additional evidence developed in the Internal Affairs investigation that Mr. Amaro was beaten during his arrest, not a single member of the OPD involved in Mr. Amaro's arrest has ever come forward to admit they struck or kicked Mr. Amaro to this day, even though one of the officers, Officer Holmgren, later admitted to Internal Affairs investigators that he heard and felt what he perceived to be blows to Mr. Amaro during the arrest. Officer Holmgren, however, claimed he did not know who delivered the blows.

Given Lt. Berlin's involvement in the supervision of the homicide investigation into Mr. Amaro's death and evidence that he was told the "whole truth" had not come out during the homicide interviews of the involved officers, Plaintiffs' counsel believe he is a critical witness and noticed his deposition for October 22, 2009, at 2:00 p.m. The deposition did not go forward after counsel for the City of Oakland indicated that Lt. Berlin was not returning his phone calls. As shown more fully below, Plaintiffs have no recourse but to ask the Court to compel Lt. Berlin's deposition or, in the alternative, compel the City to produce his contact information so he can be subpoenaed for deposition.

### INABILITY TO INFORMALLY RESOLVE DISCOVERY DISPUTE

In its Rule 26 initial disclosures, the City of Oakland identified Lt. Paul Berlin as a witness having pertinent information concerning this case. The City's initial disclosures stated that Lt. Berlin could be contacted through Senior Deputy City Attorney, Stephen Q. Rowell, at the Oakland City Attorney's Office. A true and accurate copy of pages 1 and 2 of the City's Rule 26 initial disclosures is attached and incorporated herein by reference as Exhibit 2.

2

Pursuant to paragraph 17 of the Court's Supplemental Order to Order Setting the Initial Case Management Conference, Plaintiffs' counsel began meeting and conferring with Defendants' counsel to set a date certain for the deposition of Lt. Berlin on August 4, 2009, after counsel had all agreed upon a series of dates when counsel were all available for depositions in this case. At that time, Plaintiffs' counsel proposed October 22, 2009, at 2:00 p.m. for Lt. Berlin's deposition. Later, Plaintiffs' counsel formally noticed Lt. Berlin's deposition for that date and time, which was a date when all counsel were available. The relevant excerpt from that deposition notice is attached as Exhibit 3.

Subsequently, Mr. Rowell, counsel for the City of Oakland who was identified in the City's initial disclosures as the contact person for Lt. Berlin, represented that Lt. Berlin was not returning his phone calls concerning the deposition. As a result, the deposition did not go forward on October 22, 2009 as noticed.

Plaintiffs' counsel requested that Mr. Rowell either agree to produce Lt. Berlin for deposition on a mutually convenient date or, in the alternative, provide Plaintiffs' counsel with Lt. Berlin's contact information (addresses and telephone numbers) so that Plaintiffs' counsel could subpoena Lt. Berlin for deposition prior to November 13, 2009. Since discovery cut-off is December 13, 2009, Plaintiffs' counsel wanted to have the opportunity to conduct follow-up written discovery, if necessary, after the conclusion of Lt. Berlin's deposition and sought to complete the deposition prior to November 13, 2009. On October 29, 2009, Mr. Rowell wrote to Plaintiffs' counsel in response to ongoing meet and confer efforts by Plaintiffs' counsel, stating:

> "As I've informed you, our office left numerous messages for Lt. Berlin on his home answering machine, but the calls have not been returned. Once you get a Court order, we'll provide you his address."

Given the above, and Plaintiffs' inability to independently locate Lt. Berlin due to the fact his addresses and phone numbers are confidential under California law, Plaintiffs respectfully move the Court for an Order compelling his deposition on dates convenient to counsel, or, in the alternative, for an Order compelling the City of Oakland to immediately disclose all of Lt. Berlin's contact information so that he may be subpoenaed for deposition. Plaintiffs also request that the Court Order that Lt. Berlin's deposition be taken on shortened time so that it may be completed prior to November 13, 2009, to allow Plaintiffs sufficient time to conduct any follow-up discovery necessitated by Lt. Berlin's testimony.

Due to the fact that close of discovery is imminent, Plaintiffs respectfully request that the Court retain jurisdiction of this discovery issue since referral to a Magistrate Judge will likely result in a delay that could prejudice Plaintiffs' ability to complete Lt. Berlin's deposition in a timely manner. Thank you for your consideration in this matter.

Very truly yours,

S/
James B. Chanin, Attorney for Plaintiffs

3



# SFGate
home of the
**San Francisco Chronicle**
Home Delivery | Subscriber Services

SEARCH  ○ SFGate  ○ Web Search by YAHOO!  | Advanced Search          Sign In | Register

Home | News | Sports | Business | Entertainment | Food | Living | Travel | Columns | Classifieds | Jobs | Real Estate | Cars | Index

Bay Area & State | Nation | World | Politics | **Crime** | Tech | Obituaries | Education | Green | Science | Health | Weird | Opinion

## Documents suggest cover-up in Oakland beating

Jaxon Van Derbeken, Chronicle Staff Writer
Sunday, May 10, 2009

PRINT   E-MAIL   SHARE   COMMENTS (10)        FONT | SIZE: [-][+]   TOOLS SPONSOR: 

Jerry Amaro complained to everyone he knew that Oakland police had beaten him.

Few people outside his own family believed the 35-year-old drug addict's story back in March 2000. It seemed no one ever would - he never lodged a complaint against police after being arrested in an undercover drug sting, his family found no witnesses to back his claim, and the lieutenant who led the operation denied that any beating had occurred.

**IMAGES**

  

View More Images

**MORE CRIME NEWS**
- 2 men arrested in former Piedmont woman's death 05.10.09
- S.F. fountain is a mess 05.10.09
- From the archives: Nixon impeachment hearings 05.10.09

A month after his arrest, Amaro died of pneumonia brought on by broken ribs and a punctured lung. Suddenly, police homicide investigators did find witnesses to back Amaro's story, and at least one officer acknowledged that police had inflicted blows that night.

Police officials even ultimately concluded that their own criminal probe had been compromised by the "blatant" interference of the lieutenant who oversaw Amaro's arrest.

Until recently, however, Amaro's family never knew about any of it. Police shelved the case quietly, handing out a 10-day suspension to the lieutenant.

Eight years after Amaro's death, that lieutenant, Ed Poulson, was promoted to captain and put in charge of police internal affairs. Only then did new allegations surrounding Amaro's death come to light, prompting the FBI to open an investigation and Amaro's family to file a $10 million civil rights lawsuit.

Investigative documents in the case, obtained by The Chronicle, raise questions about not only what happened during Amaro's arrest, but also whether officials in the Police Department and Alameda County district attorney's office short-circuited the criminal probe of what occurred that night.

### An ill-fated drug buy

Amaro was caught in the first drug sting Ed Poulson ever ran.

Poulson, now 46, joined the Oakland Police Department in 1987 and spent time in administrative jobs, including a stint in internal affairs, before being promoted to lieutenant. He was supervising the undercover drug operation the evening of March 23,

**TopHomes**
From
**Coldwell Banker**

**DANVILLE**
5 BR / 3 BA
$1,849,000

**FREMONT**
3 BR / 2 BA
$495,000

**MONTCLAIR, PIEDMONT AVE, CITY OF PIEDMONT**
3 BR / 2 BA
$1,250,000

**OAKLAND**
2 BR / 2 BA
$450,000

**BERKELEY**
4 BR / 2 BA
$549,000

**UNION CITY**
3 BR / 2 BA
$440,000

**FREMONT**
3 BR / 2 BA
$599,000



Now you can fly through airport security in Boston.

Sign up for the Clear Card, and you'll be precleared to zip past security lines.

Find out how ›



MOST COMMENTED    MOST READ    MOST E-MAILED

1. Miss California's fate to be decided by Monday
2. Documentary purports to rip GOP's closet doors
3. State's future at stake in May 19 vote
4. S.F. is fed up, and loitering law passes easily
5. 5 years on, gay marriage debate fades in Mass.
6. GOP: Closing Guantanamo prison threatens security
7. Deputy pleads guilty in bike-crash deaths

Exhibit 1

2000, when his officers ensnared Amaro trying to buy crack cocaine at Holly Street and 73rd Avenue in East Oakland.

Amaro ran, was chased down by uniformed officers and, after being tackled, was put in a police cruiser. Two other suspects in the car said Amaro had complained of pain from being beaten by officers and had demanded to see a doctor, an internal affairs investigation found.

The officers who were in the cruiser, however, said they hadn't heard anything like that. Poulson told internal affairs that Amaro said he had been beaten, but that when he had asked Amaro to lift his shirt, he had seen no sign of injury.

Poulson said he figured Amaro was simply faking it to avoid arrest. Two reports filed by officers involved in the arrest made no mention of police having used force.

Amaro was held for five days, through March 28, at jails run by the county Sheriff's Department. He consistently complained of pain, jail authorities told police. Reports indicate he was given only Motrin before being released on his own recognizance.

He told family members that he had first thought the officers who tackled him were robbers, because they came up from behind and beat him without identifying themselves, according to documents in the case. Still, he never filed a complaint against police.

On April 17, Amaro went to the East Oakland Health Center, where he told a doctor that police had beaten him - although he told a nurse that a friend had done it - according to a police summary of the investigation. An X-ray the following day revealed that he had five broken ribs. Doctors told him to go to the hospital, but he never did.

On April 20, he moved into a friend's house. He died in the basement there the next day.

## Police open probe

Oakland police opened an investigation soon after Amaro was found dead April 21. Relatives told patrol officers that Amaro had been involved in a clash with police, and patrol alerted the homicide division, which is charged with investigating officer-involved deaths.

The probe was led by Sgt. Gus Galindo, a veteran investigator, who compiled a log of his findings through May 10, 2000, when prosecutors decided not file charges. The Chronicle obtained a copy of the log, but Galindo, who is still with the department, declined to be interviewed.

Galindo first talked to Poulson, who along with two uniformed officers had chased down Amaro and restrained him. Poulson told him that no officers had used force.

Galindo, however, found a woman in the neighborhood who said she had seen two undercover officers punch Amaro several times in the back as he struggled with a third officer.

She reported hearing Amaro ask, "Why did you slam me?" and one of the officers reply, "You slammed me first."

In all, nine officers were interviewed by homicide investigators April 25, and all nine said they hadn't beaten Amaro or seen anyone hit him.

The next day, however, a critical tip cast doubt on the integrity of the investigation. The




BERKELEY
4 BR / 4 BA
$1,888,000

FREMONT
4 BR / 2 BA
$660,000

CASTRO VALLEY
4 BR / 3 BA
$1,250,000

See more from this broker

About Top Homes



ADVERTISERS

Hawaii $385 + 3 Nights with Air Pleasant Holidays

Equifax can help you monitor your credit score

Join the Chronicle Wine Club. Only $39.95 per month!

tip was fielded by the head of the homicide unit, Lt. Paul Berlin, who had already been consulting with District Attorney Tom Orloff about the case.

## 'Whole truth' held back

On the evening of April 26, two police supervisors who worked with the arresting officers told Berlin that the officers had said the "whole truth" did not come out in their interviews, according to an internal affairs report obtained by The Chronicle.

Galindo's log indicates the tip was sent up the police chain of command late that night.

The next day, Galindo briefed then-Chief Richard Word and "was directed to transfer the case" from homicide to internal affairs, his log notes. It gives no explanation for the move.

This decision was critical. Unlike in criminal interviews, information learned in internal affairs probes often cannot be used in criminal court under state law. The decision, in effect, ended the criminal investigation into Amaro's death and meant no police would be prosecuted.

Word, however, said in an interview that he had not ordered that the criminal probe be halted.

"I did not direct that the case be stopped - that's ridiculous," said Word, who is now Vacaville's chief of police. "I don't know who directed (Galindo) - I didn't."

Word added that he had not known until being notified by The Chronicle that the homicide investigation was handed over to internal affairs.

"That's news to me," he said. "I thought the case was fully investigated and that the D.A. chose not to file."

## Who knew what, and when

The Chronicle's review of the documents raises deeper questions about what police officials and prosecutors knew at the time Word met with Galindo and the case was transferred to internal affairs.

A report by the internal affairs investigator, Sgt. Bill Wallace, suggests that District Attorney Orloff decided before April 26, when police got the "whole truth" tip, that no crime had been committed. It is silent on the question of whether police ever relayed the tip to Orloff.

Galindo's log reflects a different story, however. It suggests that Orloff made critical decisions a day after Berlin, the homicide unit leader, and police brass were told officers might be holding back.

The homicide investigator's log says that on the afternoon of April 27 - three hours after Word met with investigators and they were ordered off the case - Berlin briefed Orloff. The district attorney said the case should go to a lower-level prosecutor for "final disposition," the log says.

Nothing in the log reflects what Orloff knew at the time. In a recent interview, the district attorney stressed that he had no memory of the case. But, he added: "Obviously, I wasn't told certain things. If I had been told, I would say, 'You've got to get to the bottom of this.' There would have been more follow-up."

Berlin, who has since left the department, declined in an interview to reveal what he

had told the district attorney. But he said he never heard about the case again after the discussion. He said he had simply been "following orders" when the case was shifted to internal affairs.

"It was a little frustrating," Berlin said. "Not a lot of information was exchanged."

Galindo, however, had not totally relinquished the case. On May 5, a second woman who lives in the East Oakland neighborhood told internal affairs investigators who had taken over the case that all of Poulson's officers had "bum-rushed" and "whupped" Amaro, who never resisted.

"He was screaming and yelling, 'Stop! OK! I give up!' " as the officers punched him, she said. Galindo noted in his log that he had told prosecutors about the second woman's account.

On May 10, Galindo's final log entry said, Deputy District Attorney Sandra Quist told him there was insufficient evidence to bring charges. Quist, who has since retired, declined to comment for this story.

## Unusual directive

With the criminal probe over, the internal affairs investigation began with an unusual order, according to a report later prepared for the Oakland city attorney's office.

Chief Word issued a directive that the arresting officers not be disciplined for lying if they changed their initial accounts, according to the report, which reviewed police documents in the case. Word said in an interview that he had no memory of giving such an order.

Only one of the officers, Roland Holmgren, did change his denial that officers had used force in arresting Amaro. Holmgren told internal affairs that he had heard and felt blows to Amaro's back while he struggled with him, but did not know who had administered them.

Two other officers told internal affairs of an "odd" encounter with Poulson on April 26, a day after Galindo's homicide investigators interviewed them. It was the same day Berlin got the tip about the "whole truth" having yet to come out.

Both officers said Poulson had summoned them to a secluded part of a police substation parking lot. He told them to speak truthfully to internal affairs, they said, but he also told them, "Be loyal to me, I'll be loyal to you."

One of the officers, Clifford Bunn, told internal affairs that he thought Poulson was both "distancing himself" from the officers and trying to influence their accounts. The other officer, Marcell Patterson, said he didn't know what Poulson had been getting at. Neither officer responded to requests to be interviewed.

The meeting ended when another supervisor, Sgt. Mike Yoell, drove up and warned Poulson, "This isn't good - this looks like a police cover-up," Poulson told internal affairs investigators.

Poulson told internal affairs that Yoell had said, "The rumors are that you hit him."

"I didn't hit this guy," Poulson said he had responded, adding, "That's all b-."

## 'No way you hit that guy'

Wallace, the internal affairs investigator, seemed satisfied with Poulson's story. He

assured the lieutenant, "There's no way you hit that guy," his report shows.

Poulson denied he had been trying to shape the officers' stories during the parking lot meeting, although he said he later apologized to Bunn and Patterson. Other accusations about Poulson's conduct soon arose, however.

On May 16 - several days after Poulson gave his version to internal affairs - the Police Department received an anonymous letter saying that just before the arresting officers were interviewed by homicide investigators, Poulson met with them at the Police Officers Association office.

He told them that he was seeking a promotion and that any accusation against him would be "going against a captain," the letter said.

The writer was never identified. Poulson had already denied to internal affairs that he had held such a meeting, and the letter went nowhere.

## Recommendation overruled

Poulson's supervisor, Capt. Ron Davis, ultimately concluded that Poulson had made a "blatant attempt" to influence officers' accounts. Far from being promoted to captain, he said, Poulson should be demoted to sergeant.

Davis also concluded that while "not directly responsible for the death of Mr. Amaro," Poulson's command failings "clearly contributed to the incident."

Then-Deputy Chief Peter Dunbar, however, recommended only a 10-day suspension and no demotion. Chief Word agreed. No one else was suspended for the operation.

The internal affairs investigation was blasted in a 2001 report by a private attorney, Laura Stevens - who, ironically, had been hired by the Oakland city attorney's office to defend it should Poulson appeal his suspension.

## 'Softball' probe

In her report to the city attorney, Stevens called the internal affairs probe "softball." She wrote that she was "mystified" that Word had directed that discrepancies between what officers told Galindo's homicide investigation and what they told internal affairs not be held against them.

Internal affairs investigators' questioning largely consisted of "offering excuses to the officers which they then (adopted)," Stevens wrote.

Independent experts contacted by The Chronicle reached similar conclusions about other aspects of the case.

Eric Safire, a private attorney who handles police misconduct lawsuits, said the decision to cut short the homicide investigation and hand the case to internal affairs "smells of a cover-up. It seems to me that the protocol would be to refer to homicide for further investigation."

Former San Francisco Police Chief Anthony Ribera said the meetings Poulson held with his officers jeopardized the probe's integrity, and that Word should have ordered officers not to talk with each other about the case.

Ribera, who now heads the International Institute of Criminal Justice Leadership in San Francisco, said any use of force against Amaro may have been justified. "But when you lie, you don't have that option of justifying it. A department has to know that if you

lie in an investigation, you will be terminated. If you lie, you die."

## Questions linger

In nine years, the Amaro case has refused to go away.

In 2005, City Attorney John Russo sent a confidential memo to then-Mayor Jerry Brown and the City Council that reviewed the department's handling of the case. Citing Stevens' report, he called the probe "procedurally improper and substantively inadequate."

Late last year, then-Police Chief Wayne Tucker picked Poulson to run internal affairs and promoted him to captain. Tucker later said he had known of the 2000 incident, but that Poulson was the "best for the job."

Someone within the Police Department then contacted the FBI, accusing Poulson himself of having kicked Amaro on the ground and then ordering officers to lie, according to authorities with knowledge of the case. News that the FBI had opened an investigation was first reported earlier this year by the Chauncey Bailey Project, a consortium of media outlets that does not include The Chronicle.

Poulson is on paid administrative leave pending the outcome of the FBI investigation and declined to comment for this story.

His lawyer, Matthew Pavone, says Poulson was guilty only of bad judgment in talking to the other officers and didn't beat anyone, let alone orchestrate a cover-up. "He got disciplined for it - he took his lumps," Pavone said.

In March, attorney John Burris - who had turned Amaro's family away in 2000 - filed a $10 million lawsuit on their behalf.

"They beat my brother, they broke his ribs. He died in agony and pain," said Amaro's sister, Stephanie Montoya. "These police officers finally came forward after all this time."

*E-mail Jaxon Van Derbeken at jvanderbeken@sfchronicle.com.*

*This article appeared on page* **A - 1** *of the San Francisco Chronicle*

PRINT    E-MAIL    SHARE

**Comments (10)** View Comments »
**Share your thoughts on this story.**

**Add Your Comment**
You must be signed in to add a comment. Sign In | Register

[ Submit ]    [ 1000 ]

**Most Recommended Comments**

**hockeydog** 5/10/2009 4:03:24 AM
The rioters in Oakland were simply supporting the wrong victims.
This, though, shows why there is so much street anger in the City where there is no "there" there.

Recommend:   (10)    (3)                                              [Report Abuse]

1  JOHN A. RUSSO, City Attorney - State Bar #129729
   RANDOLPH W. HALL, Assistant City Attorney - State Bar #080142
2  WILLIAM E. SIMMONS, Supervising Trial Attorney- State Bar #121286
   STEPHEN Q. ROWELL, Sr. Deputy City Attorney- State Bar #098228
3  One Frank Ogawa Plaza, 6th Floor
   Oakland, California 94612
4  Telephone: (510) 238-3865    Fax: (510) 238-6500
   sqrowell@oaklandcityattorney.org
5
   Attorneys for Defendants
6  CITY OF OAKLAND, RICHARD WORD,
   R. HOLMGREN, S. NOWAK, M. BATTLE,
7  E. KARSSEBOOM, C. BUNN and
   M. PATTERSON
8  20784/576968

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF JERRY A. AMARO III; GERALDINE MONTOYA; STEPHANIE MONTOYA,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF OAKLAND; RICHARD WORD; EDWARD POULSON; R. HOLMGREN; S. NOWAK; M. BATTLE; E. KARSSEBOOM; C. BUNN; M PATTERSON; individually and in their capacities as members of the CITY OF OAKLAND Police Department, DOES 1-100, inclusive,<br><br>Defendants | Case No.: C09-01019 WHA<br><br>**INITIAL DISCLOSURES OF CITY OF OAKLAND, RICHARD WORD, R. HOLMGREN, S. NOWAK, M. BATTLE, E. KARSSEBOOM, C. BUNN and M. PATTERSON** |

Defendants CITY OF OAKLAND, RICHARD WORD, R. HOLMGREN, S. NOWAK, M. BATTLE, E. KARSSEBOOM, C. BUNN and M. PATTERSON Initial Disclosure pursuant to Federal Rules of Civil Procedure, Rule 26(a)(1) and Local Rule 16-5.

(A)  **WITNESSES**

The following witnesses may have pertinent information about the facts of this case and may be reached through Senior Deputy City Attorney Stephen Q. Rowell, c/o

DEFENDANT CITY OF OAKLAND's et al.
INITIAL DISCLOSURES                                    Case No. C09-01019 WHA

Exhibit 2

-2-

Oakland City Attorneys Office, One Frank Ogawa Plaza, 6th Fl., Oakland, CA 94612:

1. Officer Roland Holmgren;
2. Officer Taiwo Pena;
3. Officer Clifford Bunn;
4. Officer Marcel Patterson;
5. Officer Eric Karsseboom;
6. Officer Steve Nowak;
7. Officer Mark Battle;
8. Officer Colin Ryan;
9. Sgt. W. Wallace;
10. Sgt. J. Madarang;
11. Sgt. Gustavo Galindo;
12. Sgt. Derwin Longmire;
13. Sgt. Jeffrey Ferguson;
14. Sgt. Ersie Joyner;
15. Sgt. J. Olivas;
16. Sgt. E. Holloman;
17. Lt. Paul Berlin;
18. Lt. Mike Yoell;
19. Lt. Anthony Rachal;
20. Lt. Rodney Yee;
21. Deputy Chief Peter Dunbar;
22. Deputy Chief Patrick Haw;
23. Capt. Ronald Davis;
24. Capt. Cyril Vierra;

DEFENDANT CITY OF OAKLAND'S
DEFENDANT CITY OF OAKLAND, et. al. INITIAL DISCLOSURES                Case No. C09-01019 WHA

-2-

JOHN L. BURRIS (SBN #69888)
LAW OFFICES OF JOHN L. BURRIS
7677 Oakport Street, Suite 1120
Oakland, California 94621
(510) 839-5200; FAX (510) 839-3882
Email: john.burris@johnburrislaw.com

JAMES B. CHANIN (SBN# 76043)
JULIE M. HOUK     (SBN# 114968)
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
(510) 848-4752; FAX: (510) 848-5819
Email: jbcofc@aol.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF JERRY A. AMARO III; GERALDINE MONTOYA; STEPHANIE MONTOYA;<br><br>          Plaintiffs,<br><br>vs.<br><br>CITY OF OAKLAND; RICHARD WORD; EDWARD POULSON; R. HOLMGREN; S. NOWAK; M. BATTLE; E. KARSSEBOOM; C. BUNN; M. PATTERSON; individually and in their capacities as members of the CITY OF OAKLAND Police Department; DOES 1-100, inclusive,<br><br>          Defendants. | CASE NO: C09-01019 WHA<br><br>**PLAINTIFFS' AMENDED NOTICE OF TAKING DEPOSITIONS AND REQUESTS FOR THE PRODUCTION OF DOCUMENTS**<br><br>**(Sgt. Wallace; Lt. P. Berlin; Deputy Chief P. Dunbar; Captain R. Davis; Def. M. Patterson; Def. T. Pena; Def. S. Nowak; Def. E. Karsseboom; Def. C. Bunn; Def. Richard Word)** |

Estate of Amaro, et al. v. City of Oakland, et al., Case No. C09-01019 WHA            1
Plaintiffs' 2nd Amended Notice of Taking Deposition and Requests for the Prod. Of Documents

Exhibit 3

**TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE THAT** on the dates and at the times set forth below, Plaintiffs will take the depositions of the present and/or former employees, agents and/or servants of Defendant City of Oakland and/or the individual Defendants identified below.

**DEPOSITIONS**

| DEPONENT | DATE | TIME |
| --- | --- | --- |
| **Sgt. Wallace** | **October 22, 2009** | **10:00 a.m.** |
| **Lt. P. Berlin** | **October 22, 2009** | **2:00 p.m.** |
| **Deputy Chief P. Dunbar** | **October 23, 2009** | **10:00 a.m.** |
| **Captain R. Davis** | **October 23, 2009** | **2:00 p.m.** |
| **Defendant M. Patterson** | **October 30, 2009** | **10: 00 a.m.** |
| **Defendant T. Pena** | **November 2, 2009** | **10:00 a.m.** |
| **Defendant S. Nowak** | **November 2, 2009** | **3:00 p.m.** |
| **Defendant E. Karsseboom** | **November 3, 2009** | **9:00 a.m.** |
| **Defendant C. Bunn** | **November 5, 2009** | **10:00 a.m.** |

The aforesaid depositions shall be taken at the Law Offices of John L. Burris, which are located at 7677 Oakport Street, Suite 1120, Oakland, California and shall be taken orally and under oath before a qualified shorthand reporter pursuant to F.R.C.P. 26, 30, 34 and/or 45.  Said depositions shall continue, day to day, until completed.

Please take further notice that the depositions of Defendants Patterson, Pena, Nowak, Karsseboom and Bunn will also be recorded via video and audio recordings.

Estate of Amaro, et al. v. City of Oakland, et al., Case No. C09-01019 WHA                      2
Plaintiffs' 2nd Amended Notice of Taking Deposition and Requests for the Prod. Of Documents