LAW OFFICES OF
# JAMES B. CHANIN
3050 SHATTUCK AVENUE
BERKELEY, CALIFORNIA 94705
(510) 848-4752
FAX (510) 848-5819

November 2, 2009

**Via E-Filing and Chamber Copy**

The Honorable William H. Alsup
Judge of the United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA  94102

      Re:  *Estate of Amaro v. City of Oakland, et al.*, Case No. C 09-0109 WHA
      Subject:  Discovery Dispute Captain Poulson's Invocation of the 5th Amendment Privilege

Dear Judge Alsup:

      This is a 42 U.S.C. Section 1983 action arising from the death of Jerry Amaro on April 21, 2000.  Mr. Amaro died as a result of injuries he sustained during his arrest by Oakland Police officers on March 23, 2000.  These injuries included five broken ribs, a lacerated/punctured lung and complications arising from those injuries.  A May 10, 2009 San Francisco Chronicle article, which succinctly sets forth the facts of the case and the police cover-up of the beating of Mr. Amaro by OPD officers, is attached and incorporated herein by reference as Exhibit 1.  The evidence obtained to date in discovery has verified virtually all of the information contained in the Chronicle article.

      This discovery dispute concerns the invocation of the Fifth Amendment testimonial privilege by Defendant Edward Poulson at his September 22, 2009 deposition with respect to any matters relating to the arrest and death of Mr. Amaro and the subsequent investigations into these events.[1]  Prior to that deposition, counsel for Captain Poulson wrote to this Court advising that

---

[1] This is now the third time an Oakland Police officer has invoked the Fifth Amendment privilege in a federal civil rights action in a case handled by Plaintiffs' counsel in this Court alone. (See, *Taylor v. City of Oakland*, Case No. C06-05169 WHA and *Woodfox v. City of Oakland*, C08-04148 WHA). The seemingly routine invocation, and subsequent waiver, of the Fifth Amendment privilege by Oakland Police officers appears to be done to gain a tactical advantage in the litigation, rather than due to any legitimate fear of criminal prosecution.

1

Captain Poulson would be invoking his Fifth Amendment privilege until the danger of any criminal prosecution was over.[2]

Captain Poulson led the drug sting that led to Mr. Amaro's arrest and he was personally involved in taking Mr. Amaro into physical custody.  Captain Poulson was also aware that Mr. Amaro was complaining of having been beaten during the arrest and of Mr. Amaro's request for medical treatment at the scene for his injuries.  Despite eyewitness accounts corroborating that Mr. Amaro was beaten during this arrest, not a single police report written by OPD officers about this event mentioned any force used on Mr. Amaro, his complaints of pain or his requests for medical treatment.  Evidence has also been adduced during discovery that Captain Poulson attempted to influence the statements given by other officers.  Captain Poulson is currently on administrative leave from the OPD due to the pending federal criminal investigation into Mr. Amaro's death, yet he has come to the depositions of the police witnesses in this case, giving him an unfair advantage if, and when, he decides to waive his Fifth Amendment privilege and testify.

Last week, Plaintiffs' counsel met and conferred with Captain Poulson's counsel concerning the issue of his continued invocation of the Fifth Amendment privilege.  At that time, Plaintiffs' counsel was informed that Captain Poulson was continuing to invoke his Fifth Amendment privilege and was continuing to decline to testify as to any issues relating to the subject matter of this litigation, namely Mr. Amaro's arrest and subsequent death.

The deadline for the close of fact discovery is December 13, 2009.  Plaintiffs are being severely prejudiced by Captain Poulson's refusal to testify about the events comprising the subject matter of this litigation and by his refusal to provide a date certain before the close of discovery when he will testify.

Plaintiffs will also be severely prejudiced in the event that Captain Poulson finally agrees to be deposed, but only after November 12, 2009, when Plaintiffs will be unable to complete any follow-up interrogatories, requests for admissions or requests for production that may be necessitated by his deposition testimony since those requests would need to be propounded by no later than November 12, 2009 to be timely in light of the December 13, 2009 discovery cut-off deadline.

Moreover, Rule 26 expert reports are due by no later than December 31, 2009.  Therefore, Plaintiffs will also be severely prejudiced if Captain Poulson were to decide at the last minute before the close of discovery that he will agree to testify.  Plaintiffs would then be forced to expedite his deposition transcript and ask that their experts work over the holidays to incorporate Captain Poulson's last minute deposition testimony into their opinions about the case and their written expert reports.  This would not only prejudice Plaintiffs in their ability to comply with the Court's deadlines for expert disclosures and dramatically increase the monetary costs for expert services that are not taxable costs, but it would also likely interfere with Plaintiffs' ability to defend against dispositive motions which Defendants' counsel indicated they plan to file.

---

[2] Since there is evidence that Mr. Amaro's death was a homicide, Captain Poulson could conceivably invoke his Fifth Amendment testimonial privilege forever since a homicide prosecution would not be barred by any statute of limitation.

2

As the Ninth Circuit noted in *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903 (9th Cir. 2008):

> "Trial courts generally will not permit a party to invoke the privilege against self-incrimination with respect to deposition questions and then later testify about the same subject matter at trial. *See FTC v. Sharp,* 782 F. Supp. 1445, 1452 (D. Nev. 1991). The Federal Rules of Civil Procedure "contemplate . . . 'full and equal discovery' . . . so as to prevent surprise, prejudice and perjury" during trial. *Id.*  "[B]ecause the privilege may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is apparent." *SEC v. Graystone Nash, Inc.,* 25 F.3d 187,   190 (3d Cir. 1994). The rights of the other litigant must be taken into consideration "when one party invokes the Fifth Amendment during discovery, but on the eve of trial changes his mind and decides to waive the privilege. At that stage, the adverse party -- having conducted discovery and prepared the case without the benefit of knowing the content of the privileged matter -- would be placed at a disadvantage." *Id.* at 191; *see also Gutierrez-Rodriguez v. Cartagena,* 882 F.2d 553, 577 (1st Cir. 1989) ("A defendant may not use the fifth amendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial."). "The opportunity to combat the newly available testimony might no longer exist, a new investigation could be required, and orderly trial preparation could be disrupted." *Graystone Nash,* 25 F.3d at 191. "'Because the privilege is constitutionally based,'" however, "the competing interests of the party asserting the privilege, and the party against whom the privilege is invoked must be carefully balanced," and '"the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side.'" *Doe ex rel. Rudy-Glanzer v. Glanzer,* 232 F.3d 1258, 1265 (9th Cir. 2000) (quoting *Graystone Nash,* 25 F.3d at 192) (addressing propriety of adverse inference as a consequence of asserting Fifth Amendment privilege during pretrial deposition)."

Given the foregoing, particularly the prejudice that has been suffered, and will continue to be suffered, by Plaintiffs due to Captain Poulson's invocation of the Fifth Amendment privilege, Plaintiffs respectfully move the Court for an Order precluding Captain Poulson from testifying at trial and from offering any written declarations in connection with any dispositive motions filed by Defendants unless he agrees to waive his Fifth Amendment privilege and testify fully as to the subject matters of this litigation on a mutually convenient date prior to November 13, 2009.

In the event that Captain Poulson declines to appear for deposition prior to November 13, 2009, and the Court precludes him from testifying at trial, Plaintiffs will also move the Court for an Order at trial allowing the jury to draw adverse inferences from his invocation of his Fifth Amendment privilege.

Very truly yours,

S/
James B. Chanin
Attorney for Plaintiffs

3



## SFGate
home of the
**San Francisco Chronicle**
Home Delivery | Subscriber Services

SFGate ○ Web Search by YAHOO! | Advanced Search    Sign In | Register

Home | News | Sports | Business | Entertainment | Food | Living | Travel | Columns | Classifieds | Jobs | Real Estate | Cars | Index

Bay Area & State | Nation | World | Politics | **Crime** | Tech | Obituaries | Education | Green | Science | Health | Weird | Opinion

### Documents suggest cover-up in Oakland beating

Jaxon Van Derbeken, Chronicle Staff Writer
Sunday, May 10, 2009

PRINT    E-MAIL    SHARE    COMMENTS (10)     FONT | SIZE: [-][+]    TOOLS SPONSOR: 

Jerry Amaro complained to everyone he knew that Oakland police had beaten him.

Few people outside his own family believed the 35-year-old drug addict's story back in March 2000. It seemed no one ever would - he never lodged a complaint against police after being arrested in an undercover drug sting, his family found no witnesses to back his claim, and the lieutenant who led the operation denied that any beating had occurred.

**IMAGES**

  

View More Images

**MORE CRIME NEWS**

- 2 men arrested in former Piedmont woman's death 05.10.09
- S.F. fountain is a mess 05.10.09
- From the archives: Nixon impeachment hearings 05.10.09

A month after his arrest, Amaro died of pneumonia brought on by broken ribs and a punctured lung. Suddenly, police homicide investigators did find witnesses to back Amaro's story, and at least one officer acknowledged that police had inflicted blows that night.

Police officials even ultimately concluded that their own criminal probe had been compromised by the "blatant" interference of the lieutenant who oversaw Amaro's arrest.

Until recently, however, Amaro's family never knew about any of it. Police shelved the case quietly, handing out a 10-day suspension to the lieutenant.

Eight years after Amaro's death, that lieutenant, Ed Poulson, was promoted to captain and put in charge of police internal affairs. Only then did new allegations surrounding Amaro's death come to light, prompting the FBI to open an investigation and Amaro's family to file a $10 million civil rights lawsuit.

Investigative documents in the case, obtained by The Chronicle, raise questions about not only what happened during Amaro's arrest, but also whether officials in the Police Department and Alameda County district attorney's office short-circuited the criminal probe of what occurred that night.

### An ill-fated drug buy

Amaro was caught in the first drug sting Ed Poulson ever ran.

Poulson, now 46, joined the Oakland Police Department in 1987 and spent time in administrative jobs, including a stint in internal affairs, before being promoted to lieutenant. He was supervising the undercover drug operation the evening of March 23,

**MOST COMMENTED   MOST READ   MOST E-MAILED**

1. Miss California's fate to be decided by Monday
2. Documentary purports to rip GOP's closet doors
3. State's future at stake in May 19 vote
4. S.F. is fed up, and loitering law passes easily
5. 5 years on, gay marriage debate fades in Mass.
6. GOP: Closing Guantanamo prison threatens security
7. Deputy pleads guilty in bike-crash deaths

**TopHomes**
From
**Coldwell Banker**

**DANVILLE**
5 BR / 3 BA
$1,849,000

**FREMONT**
3 BR / 2 BA
$495,000

**MONTCLAIR, PIEDMONT AVE, CITY OF PIEDMONT**
3 BR / 2 BA
$1,250,000

**OAKLAND**
2 BR / 2 BA
$450,000

**BERKELEY**
4 BR / 2 BA
$549,000

**UNION CITY**
3 BR / 2 BA
$440,000

**FREMONT**
3 BR / 2 BA
$599,000



Now you can fly through airport security in Boston.

Sign up for the Clear Card, and you'll be precleared to zip past security lines.

Find out how >

Exhibit 1



2000, when his officers ensnared Amaro trying to buy crack cocaine at Holly Street and 73rd Avenue in East Oakland.

Amaro ran, was chased down by uniformed officers and, after being tackled, was put in a police cruiser. Two other suspects in the car said Amaro had complained of pain from being beaten by officers and had demanded to see a doctor, an internal affairs investigation found.

The officers who were in the cruiser, however, said they hadn't heard anything like that. Poulson told internal affairs that Amaro said he had been beaten, but that when he had asked Amaro to lift his shirt, he had seen no sign of injury.

Poulson said he figured Amaro was simply faking it to avoid arrest. Two reports filed by officers involved in the arrest made no mention of police having used force.

Amaro was held for five days, through March 28, at jails run by the county Sheriff's Department. He consistently complained of pain, jail authorities told police. Reports indicate he was given only Motrin before being released on his own recognizance.

He told family members that he had first thought the officers who tackled him were robbers, because they came up from behind and beat him without identifying themselves, according to documents in the case. Still, he never filed a complaint against police.

On April 17, Amaro went to the East Oakland Health Center, where he told a doctor that police had beaten him - although he told a nurse that a friend had done it - according to a police summary of the investigation. An X-ray the following day revealed that he had five broken ribs. Doctors told him to go to the hospital, but he never did.

On April 20, he moved into a friend's house. He died in the basement there the next day.

## Police open probe

Oakland police opened an investigation soon after Amaro was found dead April 21. Relatives told patrol officers that Amaro had been involved in a clash with police, and patrol alerted the homicide division, which is charged with investigating officer-involved deaths.

The probe was led by Sgt. Gus Galindo, a veteran investigator, who compiled a log of his findings through May 10, 2000, when prosecutors decided not file charges. The Chronicle obtained a copy of the log, but Galindo, who is still with the department, declined to be interviewed.

Galindo first talked to Poulson, who along with two uniformed officers had chased down Amaro and restrained him. Poulson told him that no officers had used force.

Galindo, however, found a woman in the neighborhood who said she had seen two undercover officers punch Amaro several times in the back as he struggled with a third officer.

She reported hearing Amaro ask, "Why did you slam me?" and one of the officers reply, "You slammed me first."

In all, nine officers were interviewed by homicide investigators April 25, and all nine said they hadn't beaten Amaro or seen anyone hit him.

The next day, however, a critical tip cast doubt on the integrity of the investigation. The



**BERKELEY**
4 BR / 4 BA
$1,888,000

**FREMONT**
4 BR / 2 BA
$660,000

**CASTRO VALLEY**
4 BR / 3 BA
$1,250,000

See more from this broker



About Top Homes



ADVERTISERS

Hawaii $385 + 3 Nights with Air Pleasant Holidays

Equifax can help you monitor your credit score

Join the Chronicle Wine Club. Only $39.95 per month!

tip was fielded by the head of the homicide unit, Lt. Paul Berlin, who had already been consulting with District Attorney Tom Orloff about the case.

## 'Whole truth' held back

On the evening of April 26, two police supervisors who worked with the arresting officers told Berlin that the officers had said the "whole truth" did not come out in their interviews, according to an internal affairs report obtained by The Chronicle.

Galindo's log indicates the tip was sent up the police chain of command late that night.

The next day, Galindo briefed then-Chief Richard Word and "was directed to transfer the case" from homicide to internal affairs, his log notes. It gives no explanation for the move.

This decision was critical. Unlike in criminal interviews, information learned in internal affairs probes often cannot be used in criminal court under state law. The decision, in effect, ended the criminal investigation into Amaro's death and meant no police would be prosecuted.

Word, however, said in an interview that he had not ordered that the criminal probe be halted.

"I did not direct that the case be stopped - that's ridiculous," said Word, who is now Vacaville's chief of police. "I don't know who directed (Galindo) - I didn't."

Word added that he had not known until being notified by The Chronicle that the homicide investigation was handed over to internal affairs.

"That's news to me," he said. "I thought the case was fully investigated and that the D.A. chose not to file."

## Who knew what, and when

The Chronicle's review of the documents raises deeper questions about what police officials and prosecutors knew at the time Word met with Galindo and the case was transferred to internal affairs.

A report by the internal affairs investigator, Sgt. Bill Wallace, suggests that District Attorney Orloff decided before April 26, when police got the "whole truth" tip, that no crime had been committed. It is silent on the question of whether police ever relayed the tip to Orloff.

Galindo's log reflects a different story, however. It suggests that Orloff made critical decisions a day after Berlin, the homicide unit leader, and police brass were told officers might be holding back.

The homicide investigator's log says that on the afternoon of April 27 - three hours after Word met with investigators and they were ordered off the case - Berlin briefed Orloff. The district attorney said the case should go to a lower-level prosecutor for "final disposition," the log says.

Nothing in the log reflects what Orloff knew at the time. In a recent interview, the district attorney stressed that he had no memory of the case. But, he added: "Obviously, I wasn't told certain things. If I had been told, I would say, 'You've got to get to the bottom of this.' There would have been more follow-up."

Berlin, who has since left the department, declined in an interview to reveal what he

had told the district attorney. But he said he never heard about the case again after the discussion. He said he had simply been "following orders" when the case was shifted to internal affairs.

"It was a little frustrating," Berlin said. "Not a lot of information was exchanged."

Galindo, however, had not totally relinquished the case. On May 5, a second woman who lives in the East Oakland neighborhood told internal affairs investigators who had taken over the case that all of Poulson's officers had "bum-rushed" and "whupped" Amaro, who never resisted.

"He was screaming and yelling, 'Stop! OK! I give up!' " as the officers punched him, she said. Galindo noted in his log that he had told prosecutors about the second woman's account.

On May 10, Galindo's final log entry said, Deputy District Attorney Sandra Quist told him there was insufficient evidence to bring charges. Quist, who has since retired, declined to comment for this story.

## Unusual directive

With the criminal probe over, the internal affairs investigation began with an unusual order, according to a report later prepared for the Oakland city attorney's office.

Chief Word issued a directive that the arresting officers not be disciplined for lying if they changed their initial accounts, according to the report, which reviewed police documents in the case. Word said in an interview that he had no memory of giving such an order.

Only one of the officers, Roland Holmgren, did change his denial that officers had used force in arresting Amaro. Holmgren told internal affairs that he had heard and felt blows to Amaro's back while he struggled with him, but did not know who had administered them.

Two other officers told internal affairs of an "odd" encounter with Poulson on April 26, a day after Galindo's homicide investigators interviewed them. It was the same day Berlin got the tip about the "whole truth" having yet to come out.

Both officers said Poulson had summoned them to a secluded part of a police substation parking lot. He told them to speak truthfully to internal affairs, they said, but he also told them, "Be loyal to me, I'll be loyal to you."

One of the officers, Clifford Bunn, told internal affairs that he thought Poulson was both "distancing himself" from the officers and trying to influence their accounts. The other officer, Marcell Patterson, said he didn't know what Poulson had been getting at. Neither officer responded to requests to be interviewed.

The meeting ended when another supervisor, Sgt. Mike Yoell, drove up and warned Poulson, "This isn't good - this looks like a police cover-up," Poulson told internal affairs investigators.

Poulson told internal affairs that Yoell had said, "The rumors are that you hit him."

"I didn't hit this guy," Poulson said he had responded, adding, "That's all b-."

## 'No way you hit that guy'

Wallace, the internal affairs investigator, seemed satisfied with Poulson's story. He

assured the lieutenant, "There's no way you hit that guy," his report shows.

Poulson denied he had been trying to shape the officers' stories during the parking lot meeting, although he said he later apologized to Bunn and Patterson. Other accusations about Poulson's conduct soon arose, however.

On May 16 - several days after Poulson gave his version to internal affairs - the Police Department received an anonymous letter saying that just before the arresting officers were interviewed by homicide investigators, Poulson met with them at the Police Officers Association office.

He told them that he was seeking a promotion and that any accusation against him would be "going against a captain," the letter said.

The writer was never identified. Poulson had already denied to internal affairs that he had held such a meeting, and the letter went nowhere.

## Recommendation overruled

Poulson's supervisor, Capt. Ron Davis, ultimately concluded that Poulson had made a "blatant attempt" to influence officers' accounts. Far from being promoted to captain, he said, Poulson should be demoted to sergeant.

Davis also concluded that while "not directly responsible for the death of Mr. Amaro," Poulson's command failings "clearly contributed to the incident."

Then-Deputy Chief Peter Dunbar, however, recommended only a 10-day suspension and no demotion. Chief Word agreed. No one else was suspended for the operation.

The internal affairs investigation was blasted in a 2001 report by a private attorney, Laura Stevens - who, ironically, had been hired by the Oakland city attorney's office to defend it should Poulson appeal his suspension.

## 'Softball' probe

In her report to the city attorney, Stevens called the internal affairs probe "softball." She wrote that she was "mystified" that Word had directed that discrepancies between what officers told Galindo's homicide investigation and what they told internal affairs not be held against them.

Internal affairs investigators' questioning largely consisted of "offering excuses to the officers which they then (adopted)," Stevens wrote.

Independent experts contacted by The Chronicle reached similar conclusions about other aspects of the case.

Eric Safire, a private attorney who handles police misconduct lawsuits, said the decision to cut short the homicide investigation and hand the case to internal affairs "smells of a cover-up. It seems to me that the protocol would be to refer to homicide for further investigation."

Former San Francisco Police Chief Anthony Ribera said the meetings Poulson held with his officers jeopardized the probe's integrity, and that Word should have ordered officers not to talk with each other about the case.

Ribera, who now heads the International Institute of Criminal Justice Leadership in San Francisco, said any use of force against Amaro may have been justified. "But when you lie, you don't have that option of justifying it. A department has to know that if you

lie in an investigation, you will be terminated. If you lie, you die."

## Questions linger

In nine years, the Amaro case has refused to go away.

In 2005, City Attorney John Russo sent a confidential memo to then-Mayor Jerry Brown and the City Council that reviewed the department's handling of the case. Citing Stevens' report, he called the probe "procedurally improper and substantively inadequate."

Late last year, then-Police Chief Wayne Tucker picked Poulson to run internal affairs and promoted him to captain. Tucker later said he had known of the 2000 incident, but that Poulson was the "best for the job."

Someone within the Police Department then contacted the FBI, accusing Poulson himself of having kicked Amaro on the ground and then ordering officers to lie, according to authorities with knowledge of the case. News that the FBI had opened an investigation was first reported earlier this year by the Chauncey Bailey Project, a consortium of media outlets that does not include The Chronicle.

Poulson is on paid administrative leave pending the outcome of the FBI investigation and declined to comment for this story.

His lawyer, Matthew Pavone, says Poulson was guilty only of bad judgment in talking to the other officers and didn't beat anyone, let alone orchestrate a cover-up. "He got disciplined for it - he took his lumps," Pavone said.

In March, attorney John Burris - who had turned Amaro's family away in 2000 - filed a $10 million lawsuit on their behalf.

"They beat my brother, they broke his ribs. He died in agony and pain," said Amaro's sister, Stephanie Montoya. "These police officers finally came forward after all this time."

E-mail Jaxon Van Derbeken at jvanderbeken@sfchronicle.com.

This article appeared on page **A - 1** of the San Francisco Chronicle

PRINT    E-MAIL    SHARE

**Comments (10)**  View Comments »
**Share your thoughts on this story.**

**Add Your Comment**
You must be signed in to add a comment. Sign In | Register

[ Submit ]                                                      [ 1000 ]

**Most Recommended Comments**

**hockeydog** 5/10/2009 4:03:24 AM
The rioters in Oakland were simply supporting the wrong victims.
This, though, shows why there is so much street anger in the City where there is no "there" there.

Recommend:    (10)    (3)                              [Report Abuse]