LAW OFFICES OF
# JAMES B. CHANIN
3050 SHATTUCK AVENUE
BERKELEY, CALIFORNIA 94705
(510) 848-4752
FAX (510) 848-5819
November 10, 2009
Via E-Filing and Chambers Copy

The Honorable William H. Alsup
Judge of the United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA  94102

      Re:  *Estate of Amaro v. City of Oakland, et al.*
      Case No. C09-01019 WHA
      Subject:  Discovery Dispute re: Evading Service of Subpoena by Lt. Paul Berlin (Ret.)

Dear Judge Alsup:

      This is a 42 U.S.C. Section 1983 action arising from the death of Jerry Amaro on April 21, 2000.  Mr. Amaro died as a result of injuries he sustained during his arrest by Oakland Police officers on March 23, 2000.  Plaintiffs are now moving the Court for an Order allowing them to effect service of a deposition subpoena on Lt. Paul Berlin (Ret.) by Federal Express and/or Certified Mail delivery at his home address because he has been evading personal service of a deposition subpoena as discussed more fully below.

      Former Oakland Police Lieutenant, Paul Berlin (Ret.), is a key witness in this case.  Lt. Berlin supervised the OPD homicide investigation into the death of Mr. Amaro.  After all of the officers involved in Mr. Amaro's arrest denied he had been beaten when they were interviewed by OPD homicide investigators on April 25, 2000, Sgt. Michael Reilly and Acting Lt. Yoell went to Lt. Berlin the following day and told him that some of the "involved officers" said that the "whole truth" of what occurred during Mr. Amaro's arrest had not come out.

      Despite the very serious implications of this information, i.e., that officers had lied or intentionally withheld critical information from the OPD homicide investigation into Mr. Amaro's death, the OPD homicide log cryptically indicated there was "unsubstantiated" information that officers might change their accounts.  There was no reference to the identities of the involved officers who said the whole truth had not come out or about the substance of the information that had been withheld by officers in their homicide statements.  There is no indication that Lt. Berlin made any effort to discover the identities of the "involved officers" who said the "whole truth" had not come out or even to interview them as "confidential informants."  On the other hand, it is equally likely that Lt. Berlin knows the identities of these officers and refused to identify them even to the District Attorney and his supervisors.  *In any event, these officers have not been identified by a single employee of the City of Oakland to this day*.

1

Sgt. Reilly recently denied at his deposition that he told Lt. Berlin that officers informed him the whole truth had come out. (Ex. 1, Reilly depo., 41:19-42:9). However, former Oakland Police Sergeant, Bill Wallace, who conducted the subsequent Internal Affairs investigation into Mr. Amaro's death, testified that Sgt. Reilly was the source of this information, but that he never ordered Sgt. Reilly in the Internal Affairs investigation to reveal the identities of these officers after Sgt. Reilly refused to do so. (Ex. 2, Wallace depo., p. 20:5-23:15). When asked for the reasons why he did not order Sgt. Reilly to divulge this information, Sgt. Wallace testified that he did not want to "screw" Sgt. Reilly. Sgt. Wallace explained that if it came out that Sgt. Reilly divulged the identities of the involved officers to Internal Affairs,

> "…Sgt. Reilly would be slandered across the whole department for coming up and telling me that he said what [an officer] said.  Now, the chance of the next investigation, whenever that might be down the road, and somebody had information, do you think they would ever come up to IA and tell them what might have happened?  Hell no.  They're going to get fried across their -- everybody's going to know. So I'm not talking about this investigation in general, but just like a regular police officer isn't going to go out and tell everybody who his informant is, 'cause he's going to get killed or no one's going to be an informant in the future.  It would be a foolish thing to do, at least in my opinion.  I would never do that."  Id.

Clearly, Lt. Berlin is a key witness since he was in a position to investigate the "whole truth" issue in the homicide investigation, yet it appears that neither he, nor anyone else, in the OPD wanted to get to the "whole truth" about what happened to Mr. Amaro for fear that officers would be viewed as snitches if others in the department learned that they came forward with the truth.

Therefore, Lt. Berlin's testimony is likely to lead to the discovery of important information concerning not only the names of witnesses to the death of Mr. Amaro, but the concerted effort by members of the OPD to cover up the true facts of what happened to him. This evidence is directly relevant to Plaintiffs' contention that defendants are estopped from raising the bar of the statute of limitations in this case.  Defendants' counsel have indicated that they intend to bring a dispositive motion on the bar of the statute of limitations and Plaintiffs should be given a full opportunity to discover evidence relating to the OPD's cover-up and misinformation about the death of Mr. Amaro to respond to such a motion.

On November 2, 2009, Plaintiffs counsel wrote to request the Court's assistance in resolving a discovery dispute concerning the setting of Lt. Paul Berlin's deposition.  As noted in Plaintiffs' previous letter, the City of Oakland withheld Lt. Berlin's home address in their initial disclosures and, instead, designated Stephen Rowell of the Oakland City Attorney's office as the contact person for Lt. Berlin. When Mr. Rowell stated that Lt. Berlin was not returning his calls concerning the setting of Lt. Berlin's deposition, Plaintiffs moved the Court for an Order compelling Lt. Berlin's home address and phone number.  Subsequently, the City of Oakland stipulated to producing this information pursuant to the previously entered protective order.

Following receipt of Lt. Berlin's contact information, Plaintiffs' counsel retained a process server who commenced efforts to personally serve Lt. Berlin with the deposition

subpoena. As stated in the attached declaration of reasonable diligence (Exhibit 3), Lt. Berlin is evading service of the subpoena. Specifically, the process server went to Lt. Berlin's home on three different occasions on November 6, 2009. At 7:00 p.m. a woman answered the door and the process server asked if Lt. Berlin was home. The woman stated that she would get him. The woman left the door ajar and the process server heard the woman speaking with a man who said, "No, no." The woman said she was "sorry" and "didn't know." The woman then returned to the door and told the process server Lt. Berlin was in the shower and would not come to the door. The process server waited and knocked on the door a few more times, but no one would answer the door. (Ex. 3).

On November 7, 2009, the process server went to Lt. Berlin's home three more times. At 9:00 p.m., someone turned on the lights to the yard at Lt. Berlin's home, but no one would answer the door when the process server knocked on it. *Id.* On November 8, 2009, the process server went to Lt. Berlin's home three more times. At 8:45 a.m. on November 8, 2009, the process server saw someone in the house rotate window blinds inside the home, but no one would respond to his knocking on the door. *Id.* Later, at 6:00 p.m., the process server encountered a woman at the residence who responded "nope," when the process server asked of Lt. Berlin was home and no one answered the door when the process server knocked on it. On November 9 and 10, 2009, Plaintiffs' counsel have been informed that additional efforts were made by Legal Express process servers to personally serve Lt. Berlin with the deposition subpoena which were unsuccessful, even though lights were on and it appeared someone was at home. Since Lt. Berlin is evading service, Plaintiffs move the Court for an Order allowing them to complete service by Federal Express and/or Certified Mail delivery of the subpoena to Lt. Berlin's home.

The plain language of Rule 45 does not require personal service of a deposition subpoena. *Tubar v. Clift*, 2007 U.S. Dist. LEXIS 5674 (W.D. Wash. 2007). [S]ome district courts have allowed service by something less than personal service as long as it ensures receipt. Id., *See Hall v. Sullivan,* 229 F.R.D. 501, 503-06 (D. Md. 2005) (Federal Express delivery sufficient to satisfy requirements of Rule 45(b)(1)); *Doe v. Hersemann,* 155 F.R.D. 630, 630-31 (N.D. Ind. 1994) (certified mail delivery sufficient because neither text nor purpose of Rule 45 requires personal service)." In *E.A. Renfroe Company, Inc. v. Moran*, 2008 U.S. Dist. LEXIS 36513 (D. Colo. 2008), the Court allowed service of a subpoena by alternative means where the non-party witness was evading service of process, concluding that "[t]he Federal Rules should not be construed as a shield for a witness who is purposefully attempting to evade service…"

Based on the foregoing, Plaintiffs respectfully move the Court for an Order allowing them to serve Lt. Berlin (Ret) with the subpoena for his deposition via Federal Express and/or Certified Mail delivery to his home for his deposition on November 19, 2009 at 10:00 a.m. A proposed Order has been prepared by Plaintiffs' counsel and is being e-filed contemporaneously herewith.

Respectfully submitted,

S/
James B. Chanin, Attorney for Plaintiffs

3

```
 1                    UNITED STATES DISTRICT COURT
 2                   NORTHERN DISTRICT OF CALIFORNIA
 3
    THE ESTATE OF JERRY A. AMARO    )
 4  III; GERALDINE MONTOYA;         )
    STEPHANIE MONTOYA,              )
 5                                  )
               Plaintiffs,          )
 6                                  )
          vs.                       )     No. C09-01019 WHA
 7                                  )
    CITY OF OAKLAND, et al.,        )
 8                                  )
               Defendants.          )
 9  _____)
10
11
12
13
14
15       DEPOSITION OF SERGEANT MICHAEL PATRICK REILLY
16                 FRIDAY, OCTOBER 16, 2009
17
18
19
20
21
22
23              RAMONA REINHARDT
       CERTIFIED SHORTHAND REPORTER NO. 2677
24              428 NORTH STREET
            OAKLAND, CALIFORNIA 94609
25              (510) 652-4337
```

CERTIFIED COPY

EXHIBIT 1

1   in it?
2       A.   Primarily a list of personnel and location.
3       Q.   Okay. And was it required for you to have a
4   written operations plan?
5       A.   I don't know that it was or not, actually.
6       Q.   Why did you have one?
7       A.   Good practice.
8       Q.   Okay. Why was it good practice?
9       A.   For documentation.
10      Q.   Okay. And what kind of documentation?
11      A.   Again, just a list of the personnel that were
12  involved.
13      Q.   Okay. Is there anything else in your operations
14  plan other than the people involved?
15      A.   Location. The ops plans have changed over the
16  years, so I'm trying to remember ops plans in 2000.
17           Yeah. Primarily location, personnel, undercovers
18  versus arresting personnel.
19      Q.   Okay. Like to show you Exhibit 30. Direct your
20  attention to paragraph -- the third full paragraph that begins,
21  "On 26 April '00," which I believe means 2000, "Sergeant Reilly
22  and Acting Lieutenant Yoell told Lieutenant Berlin of the
23  homicide section that some of the involved officers indicated
24  to them that the whole truth concerning the incident had not
25  come out."

DEPOSITION OF SERGEANT MICHAEL PATRICK REILLY

```
 1      A.   Okay.
 2      Q.   Is that accurate?
 3      A.   Not exactly.
 4      Q.   Okay. It's not -- what about it is not exactly
 5   accurate?
 6      A.   Well, we didn't tell him the whole truth didn't
 7   come out.
 8      Q.   Okay. What did you tell him?
 9      A.   At least I didn't.
10      Q.   What did you tell him?
11      A.   The concern, and it was after they'd expressed
12   their concern.
13      Q.   Okay. So you didn't express any concern to them
14   until they expressed a concern to you; is that your testimony?
15      A.   I believe so.
16      Q.   Okay. And so they sought you out, you did not seek
17   them out; is that your testimony?
18      A.   Again, I believe so.
19      Q.   And did they call you both into some meeting, or
20   did they just encounter you?
21      A.   I don't recall a meeting, so I think it was just an
22   encounter.
23      Q.   Okay. Like an encounter in the hallway?
24      A.   Something like that.
25      Q.   Okay. And it says here that some of the involved
```

42

RAMONA REINHARDT, CSR 2677

1   officers indicated to them that the whole truth concerning the
2   incident had not come out.  Did some of the officers indicate
3   to you that the whole truth about this incident had not come
4   out?
5       A.   No.
6       Q.   So this statement is not accurate?
7       A.   I think it's misworded.
8       Q.   How is it misworded?
9       A.   Well, again, Yoell and I never actually went to
10  homicide to say that, and it was in conjunction with their
11  concern that there was possibly a truthful issue.
12      Q.   Okay.  So let me understand exactly what you're
13  saying, because we want a clear record of your testimony.  Are
14  you saying that at no time did any of the involved officers
15  indicate to you that the whole truth concerning this incident
16  had not come out?
17      A.   No.  Again, it was a feeling.
18      Q.   Okay.  So some of the officers did indicate to you
19  that the whole truth concerning the incident had not come out?
20           MR. VERBER:  Misstates his testimony.
21           MR. ROWELL:  Yeah, I think it does.
22           MR. CHANIN:  Q.  It's a question.  I'm not asking
23  you to -- I'm not stating your testimony.  I'm asking you a
24  question.
25      A.   Ask it again, please.

43

```
                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA


THE ESTATE OF JERRY A. AMARO    )
III; GERALDINE MONTOYA;         )
STEPHANIE MONTOYA,              )
                                )
              Plaintiffs,       )
                                )
        vs.                     )         No. C09-01019 WHA
                                )
CITY OF OAKLAND, et al.,        )
                                )
              Defendants.       )
_____)
```

DEPOSITION OF WILLIAM CHARLES WALLACE

THURSDAY, OCTOBER 22, 2009

RAMONA REINHARDT
CERTIFIED SHORTHAND REPORTER NO. 2677
428 NORTH STREET
OAKLAND, CALIFORNIA 94609
(510) 652-4337

CERTIFIED COPY

EXHIBIT 2

```
 1  him on so many cases, I don't know if I talked about this one
 2  or not.
 3       Q.   Well, did they refuse to tell you who these
 4  involved officers were?  Well, let's break it down.
 5            Did Sergeant Reilly refuse to tell you who the
 6  involved officers were?
 7            MR. ROWELL:  Objection.  Calls for speculation on
 8  Reilly's state of mind.
 9            But you can answer the question if you can.
10            THE WITNESS:  I don't know if it was a refusal or
11  if he was trying to be cute like a secret agent or what, but he
12  wouldn't tell me who they were.
13            MR. CHANIN:  Q.  Okay.  Well, why didn't you have
14  him ordered to tell you who they were?
15       A.   'Cause I'd rather talk to him.  I didn't.
16       Q.   You didn't what?
17       A.   I didn't think about that.
18       Q.   Okay.
19       A.   I wouldn't have done it anyway.
20       Q.   Pardon me?
21       A.   I wouldn't have done it anyway.
22       Q.   Why not?
23       A.   'Cause I was going to talk to every single person
24  anyway.  Him telling me is hearsay, so I'm going to go through
25  everybody one by one.  I'm going to get to -- if the truth's
```

                                                                20

```
 1   going to come out, I'm going to get it.  I don't need to get
 2   him in trouble, put him out on Front Street, whatever, however
 3   you want to look at it.  I'm going to get to it anyway.
 4        Q.   What's so bad about getting him in trouble?
 5        A.   It's not good to get anybody in trouble if they
 6   don't need to be.  If someone's trying to help me out, about
 7   the worst thing I can do, not only for myself but for internal
 8   affairs as an investigative unit, is to screw them.  So I don't
 9   think that would be a good idea to do.
10        Q.   Well, I don't -- well, how could you "screw him" by
11   asking him what officers have told him that the whole truth
12   hadn't come out?
13        A.   Well, let's say he came in and said that Tai didn't
14   tell the truth.
15        Q.   That who?
16        A.   Tai.  Tai Pena.
17        Q.   Okay.
18        A.   And I bring Tai in and say, "Hey, you didn't tell
19   the truth 'cause Reilly told me you didn't tell the truth."
20   Well, that would cause a real problem.  Reilly would never tell
21   me anything else again and internal affairs in general.  It
22   would just -- it would hamper my ability as an investigator.  I
23   wouldn't do that.
24             That isn't what happened.  He didn't tell me the
25   names.  Had he told me the names, I would have done whatever I
```

21

1  could to get into that information without ever having him come
2  forward or be known that he gave me the names, but he didn't
3  tell me who.
4      Q.  And did you not order him to tell you the names?
5  Is the reason you did not order -- well, strike that.
6          Did you order him to tell you the names?
7      A.  Yeah, I didn't.  I didn't.  I didn't think about
8  it, and wouldn't if I had.
9      Q.  And why wouldn't you have?
10     A.  Same reason I said last time.  I just said I
11 wouldn't do that.
12     Q.  Okay.  You wouldn't do that because it's not an
13 effective investigation technique; is that what you're saying?
14     A.  No.  I'm saying what would it accomplish?  I'm
15 going to talk to everybody that was there.  Whether he tells me
16 this person says he didn't tell the truth or not doesn't really
17 matter.  I'm going to talk to them face to face, one on one,
18 and give them the opportunity to tell the truth.  I just don't
19 see how that would accomplish anything.
20     Q.  Okay.  So it's not -- you don't think it would have
21 been an effective investigation technique.  Let's continue with
22 your analogy or your hypothetical that Sergeant -- I'm sorry --
23 Officer Pena told him that the whole truth hadn't come out.
24 Okay?  So wouldn't it have been an effective investigation
25 technique to tell her that you already know she told Sergeant

1  Reilly that the whole truth hadn't come out? That wouldn't be
2  an effective technique?
3     A.    No, because Reilly would be slandered across the
4  whole department for coming up and telling me that he said what
5  Tai said. Now, the chance of the next investigation, whenever
6  that might be down the road, and somebody had information, do
7  you think they would ever come up to IA and tell them what
8  might have happened? Hell no. They're going to get fried
9  across their -- everybody's going to know.
10          So I'm not talking about this investigation in
11 general, but just like a regular police officer isn't going to
12 go out and tell everybody who his informant is, 'cause he's
13 going to get killed or no one's going to be an informant in the
14 future. It would be a foolish thing to do, at least in my
15 opinion. I would never do that.
16    Q.    Okay. So then was it your impression that Sergeant
17 Reilly knew who these officers were?
18    A.    Well, I guess, yeah, I would think so.
19    Q.    Why would you think so?
20    A.    Unless he got it secondhand. Now, that could be.
21 I didn't -- maybe he got it secondhand, but maybe it was just
22 rumor.
23          MR. ROWELL: Yeah, don't guess or speculate. If
24 you know, you know.
25          THE WITNESS: I'm sorry.

LAW OFFICES OF JAMES B. CHANIN
3050 Shattuck Avenue
Berkeley, CA 94705

Attorney for Plaintiff, ESTATE OF JERRY A. AMARO, III, ET AL.

UNITED STATES DISTRICT COURT
For the
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF JERRY A. AMARO, III, ET AL | CASE NO. C09-01019 WHA |
| Plaintiff, | AFFIDAVIT OF REASONABLE DILIGENCE – NON SERVICE |
| Vs. | |
| CITY OF OAKLAND, ET AL. | |
| Defendants. | |

1. **Documents served: Subpoena to Serve at a deposition or to produce documents in a civil action.**
2. At the time of service I was at least 18 years of age and not a party to this action. At the time of service I was a registered California process server. Personal service was attempted on the defendant as follows:
3. **Name of person to be served**: PAUL BERLIN
4. **RESIDENCE:** 5620 Shadow Ridge Drive, Castro Valley, California

| DAY | DATE | TIME | LOCATION | REASON FOR NON SERVICE |
|---|---|---|---|---|
| Fri | 11/6/09 | 9:30 a.m. | Residence | No answer at the door |
| | 11/6/09 | 2:30 p.m. | Residence | No answer at the door |
| | 11/6/09 | 7:00 p.m. | Residence | A woman answered the door. I asked her if her husband Paul Berlin was home. She said to wait and she would get him. She left the door slight ajar. I heard her talking. A male voice said, "No, No." She responded with, "I'm sorry, I didn't know." The woman then came to the door and said her husband was unavailable as he was in the shower. I waited and tried repeated knocking but the door was not opened again. |
| Sat | 11/7/09 | 9:30 a.m. | Residence | No answer at the door |
| | 11/7/09 | 4:00 p.m. | Residence | No answer at the door |
| | 11/7/09 | 9:00 p.m. | Residence | Lights on in the backyard on. As I approached the front yard light turned on. I tried repeated knocking but no one answered the door. |

EXHIBIT 3

| Sun | 11/8/09 | 7:00 a.m.-8:45 a.m. | Residence | I arrived and waited to see if someone would come out of the house. The newspaper boy delivered a newspaper but the door was not opened for someone to get the paper. At 8:40 a.m. I saw a woman in the front room rotate the blinds open and peer through. I knocked on the door repeatedly but there was no answer. |
| | | 6:00 p.m. | Residence | I was approaching the home and saw the garage door open. A woman put the garbage out and then was getting in her car to leave. I asked her if Paul Berlin was home and she replied, "Nope." I repeatedly knocked on the door but it was not opened. |

5. Person executing, Walid Hamze, Legal Express, 7272 Burton Street, Dublin, CA 94568, (925) 998-1512, Alameda Process Server: 1027
5. Fee for service: 200.00
6. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  11/09/09

_____
WALID HAMZE