1
2
3
4
5
6
7
8
9

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10  THE ESTATE OF JERRY A. AMARO III,          No. C 09-01019 WHA
    GERALDINE MONTOYA, and
11  STEPHANIE MONTOYA,

12          Plaintiffs,                        **ORDER ON MOTION FOR**
                                               **SUMMARY JUDGMENT AND**
13     v.                                      **CERTIFICATION UNDER**
                                               **28 U.S.C. 1292(b)**
14  CITY OF OAKLAND, RICHARD WORD,
    EDWARD POULSON, R. HOLMGREN, S.
15  NOWAK, M. BATTLE, E. KARSSEBOOM,
    C. BUNN, M. PATTERSON, individually
16  and in their capacities as members of the City
    of Oakland Police Department, and
17  DOES 1–100, inclusive,

18          Defendants.
                                    /
19

20                              **INTRODUCTION**

21          This Section 1983 action poses a difficult limitations question.  Before he died from his

22  injuries, the son of plaintiff Geraldine Montoya told her that the Oakland police were the ones

23  who had beaten him.  She believed him.  Upon his death shortly thereafter, she almost filed suit

24  but was dissuaded from doing so by affirmative and misleading statements and conduct by

25  Oakland police.  Many years after the limitations period lapsed, a federal investigation into the

26  matter revived her determination.  She commenced this action, asserting equitable estoppel to

27  avoid the time bar.  This order agrees that a jury should determine whether defendants'

28  affirmative statements and conduct misled and dissuaded Ms. Montoya from commencing suit

    within the

United States District Court

For the Northern District of California

1    limitations period.  No decision of the court of appeals compels an outcome either way.  Because

2    an interlocutory appeal of this substantial question would materially advance the litigation, this

3    order will also certify the issue for such an appeal under 28 U.S.C. 1292(b).

4                                              **STATEMENT**

5             On March 23, 2000, Jerry A. Amaro III was arrested in Oakland during a drug sting

6    commanded by Oakland police officer Edward Poulson.  Also involved in the arrest were police

7    officers Eric Karsselboom, Clifford Bunn, Marcell Patterson, Roland Holmgren, Taiwo Pena,

8    Mark Battle, and Steve Nowak (Chanin Decl. Exh. 9; Rowell Decl. Exh. 5).

9             A witness to the March 23 arrest, Timothy Murphy, testified under oath that he saw

10   undercover officers kicking Amaro in the ribs, kneeing Amaro in the back, and punching Amaro

11   in his face while being pinned to the ground (Murphy Dep. 24–31, 81).  Another witness to the

12   arrest, Theresa Batts, informed police during the course of an internal investigation into the arrest

13   that officers were "overly violent" and inflicted blows that "were unnecessary" (Exh. 9 at 20).

14   Batts also testified under oath corroborating these observations (Batts Dep. 11–21).  A third

15   witness to the arrest, Laureen White, also apparently saw officers "use their fists to strike Amaro .

16   . . in the back" during his arrest (*ibid.*).  According to his March 23 arrest report, Amaro was five

17   feet, five inches tall, and weighed 150 pounds (Chanin Decl. Exh. 20).

18            While being transported to jail, two witnesses testified that Amaro complained of pain in

19   his ribs and requested medical attention from officers (Murphy Dep. 36, 46; Garry Dep. 24–30).

20   Witness Murphy testified under oath that Amaro told two patrolmen, "I think you guys broke my

21   ribs," "I'm having difficulty breathing," and "I need to see a doctor," and that Amaro displayed

22   physical symptoms corroborating these statements (Murphy Dep. 36, 47).  Jailer Khalid

23   Mohammed, who was at the admitting desk of the jail when Amaro was admitted, also testified

24   that Amaro had bruises on his face and complained of rib injuries at the time of booking

25   (Mohammed Dep. 24, 33–35; Chanin Decl. Exh. 9 at 23).  The jail medical pre-screening form

26   corroborated these observations (Chanin Decl. Exh. 29).

27            Witness Murphy also shared a jail cell with Amaro for five days following the March 23

28   arrest and testified that Amaro moaned in pain each day and could barely get up from his bed

                                                      2

United States District Court

For the Northern District of California

1   (*id.* at 51–53, 60).  According to Murphy and Amaro was only given Tylenol for his pain, despite

2   Murphy's opinion that "Ray Charles could have saw he was beat up" (*id.* at 51, 60).  Oakland jail

3   medical records corroborated that only painkillers were administered to Amaro while in custody

4   (Chanin Decl. Exh. 32).

5        Amaro was released from custody on March 28 (*id.* Exh. 9 at 14).  After returning home,

6   Amaro informed his mother, plaintiff Geraldine Montoya, that he had been beaten by Oakland

7   police officers and that he had asked for medical attention several times but was denied treatment

8   (G. Montoya Dep. 43–45).  Amaro showed his mother several large bruises on both his face and

9   body in support of this assertion (*id.* at 44).

10        On or about April 18, Amaro sought medical treatment for his injuries and had

11   x-rays taken of his chest and torso (Chanin Decl. Exh. 34).  The examination by Dr. Angelica

12   Green revealed that Amaro had suffered five fractured ribs and a collapsed lung (*ibid.*; Green

13   Dep. 12; Chanin Decl. Exhs. 35, 36).  Although Amaro appeared "stable," Dr. Green

14   recommended that Amaro seek immediate emergency care to drain fluid from his chest, which

15   Amaro — according to Dr. Green's notes in Amaro's medical records — did not agree to do

16   (Chanin Decl. Exh. 34; Green Dep. 11, 17).  Dr. Green also allegedly gave Amaro a paper — now

17   non-existent — stating that his injuries were caused by Oakland police, which Amaro supposedly

18   gave to his mother for safekeeping (G. Montoya Dep. 81–82).[1]  Amaro told his mother that he

19   believed the paper was important to the lawsuit he intended to file against the City of Oakland (*id.*

20   at 73; 78–79).  Between the time of his arrest and death, Amaro apparently told numerous

21   individuals that he had been beaten by Oakland police officers, showing them his x-rays as

22   evidence of his injuries (*id.* at 64–67; 90; Galindo Dep. 160).

23        Amaro died at the home of Gilbert Becerra on April 21, 2000 (Galindo Dep. 159; Chanin

24   Decl. Exh. 37).  According to the sworn testimony of Dr. Sharon Van Meter, the physician who

25

26        [1] The identity of this paper is unclear.  Its existence is based solely upon Geraldine
    Montoya's deposition testimony.  That said, Dr. Green noted in her deposition that she had

27   written down "fist to left chest wall" (in shorthand) on Amaro's medical report during his
    April 18th medical examination (Green Dep. 13).  This, however, was not her objective

28   medical opinion, but simply a record of what Amaro had told her during the examination
    (*ibid.*).

United States District Court

For the Northern District of California

1   performed Amaro's autopsy and prepared his autopsy report, the five rib fractures suffered by

2   Amaro could only have been caused by "considerable force" beyond "being gently hit or falling .

3   . . on the floor" (Van Meter Dep. 28).  In other words, Mr. Amaro's multiple rib injuries were

4   either caused by "a severe blow" or "multiple blows . . . at multiple times" (*id.* at 23–24, 28).  The

5   autopsy report prepared by Van Meter on April 23 described Amaro's cause of death as

6   "brochopneumonia and hemothorax due to multiple rib fractures due to blunt trauma to the chest"

7   (Chanin Decl. Exh. 59).  In other words, someone beat him severely and he died as a result.

8          Amaro's death was investigated by a team of Oakland homicide investigators led by

9   Sergeant Gus Galindo.  To be clear, it appears that numerous investigators were working under

10   Galindo and reporting back to him on their findings.  On the morning of Amaro's death, these

11   investigators interviewed Becerra.  He said that when Amaro had arrived at his home the evening

12   before, he did not appear to be doing well (Galindo Dep. 159–160).  Becerra told homicide

13   investigators that Amaro had told him that his injuries were caused by being beaten by police

14   during a recent arrest (*id.* at 160).  Becerra's statement appeared in the "Crime Report" filed by

15   the homicide investigators who responded to the 911 call reporting Amaro's death (Chanin Decl.

16   Exhs. 37).

17          A "Follow-Up Investigation Report" originally filed by Galindo on the day of Amaro's

18   death also documented these statements by Becerra (Chanin Decl. Exh. 42 at 1, 2).  This order

19   notes that this follow-up investigation report appears to have been continually updated throughout

20   the course of the homicide investigation, which extended well after February 21, 2000.  In

21   addition to Becerra's statements, the report contained a notation that "[h]ypodermic needles and

22   narcotic paraphernalia" were located in Becerra's basement around Amaro's body (*ibid.*).  This

23   follow-up report, as well as Sergeant Galindo's sworn deposition, also indicated that Galindo (or

24   the team of homicide investigators that were reporting to him) sought and reviewed Amaro's

25   March 23 arrest report at around noon on April 21 — the same day that Amaro passed away —

26   and found that "[t]here was no indication [in the arrest report] that force was used by the officers"

27   during the arrest (*id.* at 2; Galindo Dep. 56).  At or around that time, Galindo was informed by the

28

United States District Court

For the Northern District of California

1   deputy coroner's office that Amaro's death did not seem unusual and was "a possible drug

2   overdose" (Chanin Decl. Exh. 42 at 2).

3      Galindo and his team of homicide investigators, however, discovered at around 1:30 p.m.

4   on April 21 that the intake correctional officer present at the police station on March 23 had

5   documented that Amaro had complained of rib pain when taken into custody following his arrest

6   (*id*. at 3). By 4 p.m. that same day, homicide investigators had (1) spoken with Dr. Green, who

7   told investigators that Amaro alleged he had been beaten by police and had suffered broken ribs

8   and possibly a punctured lung, (2) reviewed the Oakland County Jail nurses log that indicated

9   Amaro had complained numerous times of rib pain and being hit by police, and (3) identified a

10  witness to the March 23 arrest, Laureen White, who had seen Oakland police beating an

11  individual matching Amaro's description (*ibid.*; Galindo Dep. 62–64).

12     At or around 5:30 p.m. on April 21, Sergeant Galindo went to Amaro's residence to

13  inform plaintiff Geraldine Montoya (Amaro's birth mother) and Lou Montoya (Amaro's step

14  father, who is not a party to this action) that Amaro had passed away (*id.* at 4; G. Montoya Dep.

15  74–81). According to Geraldine Montoya's deposition and sworn declaration, Sergeant Galindo

16  informed her that "a gang beat [Amaro] up" and that his death was "gang related, and [Amaro]

17  died in the street" because he was "mixed up with a gang and drugs" (G. Montoya Dep. 75–79; G.

18  Montoya Decl. Exh. A ¶ 5). He does not deny he said this. In response, she informed Galindo

19  that her son was not in a gang, did not do drugs, and that her son had told her that he had been

20  beaten during a recent arrest by Oakland police officers (G. Montoya Decl. Exh. A ¶ 6; Galindo

21  Dep. 65–66). Amaro's step-father also informed Galindo of Amaro's allegations regarding his

22  alleged beating by Oakland police officers (G. Montoya Decl. Exh. A ¶ 7). Despite being told

23  these allegations, Galindo continued to represent to both Montoyas that Amaro's death was due to

24  gang involvement or drug use (*ibid.*).

25     In his deposition, Sergeant Galindo testified that while he remembered hearing the

26  allegations from the Montoyas regarding Amaro being beaten by Oakland police, he "d[id]n't

27  recall exactly what [he] told them" regarding Amaro's death because "[he] did not know what

28  [Amaro] died of at that point" (Galindo Dep. 66). This was, according to Galindo, "standard

police investigation" to see what the Montoyas knew first before giving them any details about Amaro's death (*id.* at 67).  That said, Sergeant Galindo admitted that "there were things coming out at that point of the investigation" supporting the Montoyas' claim that Amaro had been beaten by police (*ibid.*).  Galindo, however, did not reveal this corroborating information to the Montoyas because he "[di]dn't want to contaminate any statement they g[a]ve" to him by giving them information up front (*ibid.*).  Even after he took a statement from Geraldine Montoya, however, Galindo did not inform the Montoyas that a witness to the alleged beating, Laureen White, had been discovered, or any other evidence existed that corroborated their claim that Amaro was beaten (*id.* at 67–68).  After the April 21 conversation, Sergeant Galindo does not recall ever speaking with Geraldine or Lou Montoya again (*id.* at 107–108).

According to Geraldine Montoya, however, she spoke with Sergeant Galindo via telephone on April 22, the day after her son's death, to seek the release of Amaro's body from the morgue and to try to obtain copies of the police reports concerning her son's death (G. Montoya Decl. Exh. A ¶ 8).  According to Montoya, Galindo denied her request to release Amaro's body until after an autopsy had been conducted — which was performed the next day — and informed Montoya that she would *not* have access to any police reports because the matter was still under investigation (*ibid.*).  Later that week, Geraldine Montoya visited the police administration building in person to attempt to obtain police records concerning the death of her son.  That request was too denied.  The matter still "under investigation" (*id.* ¶ 9).  While at the police building, Ms. Montoya attempted to speak with Sergeant Galindo.  Galindo, however, was "unavailable."   She left her name and phone number with a request for him to call her back (*ibid.*).  Approximately a month and a half later, Sergeant Galindo phoned Geraldine Montoya.  Galindo was allegedly "very rude and brusque."  He questioned her "Why do you need the [police and autopsy] reports?" (*id.* ¶ 10).  After Montoya told Sergeant Galindo that she wanted to find out why her son died, he allegedly told her that he was "too busy" to speak to her and then hung up the phone (*ibid.*).

Because Amaro had been in police custody within a reasonable period of time prior to his death and there were early indications that "some force" was used to arrest Amaro on March 23,

United States District Court

For the Northern District of California

1    based upon a "totality of the circumstances," Sergeant Galindo and his team of homicide

2    investigators treated Amaro's death as an "in custody" homicide (Berlin Dep. 39–40). To be

3    clear, this was not a "new" homicide investigation, but a continuation of the same investigation

4    that began with the discovery of Amaro's body.

5            During the course of this homicide investigation, Galindo and other investigators

6    developed concerns that the officers involved in Amaro's arrest may not have been telling the

7    truth or had, at the very least, provided an incomplete account of the events that occurred on

8    March 23, 2000 (Berlin Dep. 73–76; Chanin Decl. Exh. 42). Specifically, Galindo attended

9    Amaro's autopsy conducted by Dr. Van Meter, and learned that Amaro's rib injuries were

10   inflicted three-to-five weeks prior to Amaro's death. Later that day, an interview with witness

11   Lauren White revealed that she had witnessed officers "us[ing] their right fists to strike down

12   towards an object she later realized was a male Hispanic" (Chanin Decl. Exh. 42 at 5). Over the

13   next three days, other witnesses and interviews, including a follow-up interview with Dr. Van

14   Meter, provided evidence supporting the conclusion that force was used during Amaro's arrest

15   despite the absence of any use of force in the police reports, and that this use of force was the

16   cause of his death (*id.* at 5–12). On April 26, Sergeant Galindo received unsubstantiated

17   information that some police officers who had already given statements to homicide investigators

18   "may change their initial summary" of the incident (*id.* at 10).

19           Galindo briefed Oakland Police Chief Richard Word, who is also a named defendant in

20   this action, about the homicide investigation on April 27, telling him "that the information . . .

21   received from the officers that had been interviewed was not what actually happened based on

22   what we were learning in the investigation" (Galindo Dep. 20). Chief Word then referred the

23   matter to Oakland Police Department's Internal Affairs Division on April 27 to begin a separate

24   IA investigation (Chanin Decl. Exh. 42 at 10). According to Lieutenant Paul Berlin, who was

25   present when Sergeant Galindo debriefed Chief Word on the investigation, this decision by Chief

26   Word to refer the investigation to IA was necessary because "[a]ll the officers had given

27   statements under *Miranda* during the criminal investigation, and he felt that the only way to try to

28   get the officers to tell the truth . . . was to grant immunity to the officers, and the only way [the

police department] could do that was to take it to internal affairs" (Berlin Dep. 85–88).[2]  That same day, Alameda District Attorney Thomas Orloff was briefed on the homicide investigation, and then directed homicide investigators to debrief the deputy district attorney assigned to the case (Chanin Decl. Exh. 42 at 10).  On May 10, 2000, the deputy district attorney concluded that there was insufficient evidence to file charges against the officers (*id.* at 12).  The homicide investigation was then designated as "unfounded" that same day, and was never reopened (*ibid.*).

The IA investigation — which was a separate investigation from the homicide investigation and did *not* involve Sergeant Galindo — was completed on August 14, 2000, over three months after the homicide investigation was closed.  The final IA report included the following findings (Chanin Decl. Exh. 9 at 26):

> Jerry Amaro was severely injured during his arrest of 23 Mar 00. His five broken ribs were most likely a result of being forcibly taken to the sidewalk, but there were at least five officers who used some form of physical prowess on the 140 pound Amaro.  There is no documentation of any use of force in the [police] report.  While the force used by the officers in this case was justified, there is no indication of any resistance on the part of Amaro or explanation for the use of force in the report.  Unfortunately, this was not an anomaly for the operation that night.
>
> There is very little doubt Amaro was struck by officers during his arrest.

The report then discussed the credibility of numerous witnesses to the arrest of Amaro, including an individual who "like[d] the police but did think the officers used too much violence in most of their arrests that night," and stated that "Amaro was struck by the uniformed officers arresting him" (*ibid.*).  Additionally, the report found that signatures were forged on the police reports for Amaro's March 23 arrest, the use of force was unacceptably left out of the police reports, and that officers were "derelict" in not responding to Amaro's requests for medical treatment (*id.* at 25–27).  Finally, the IA investigation concluded that defendant Poulson inappropriately met with other officers prior to their being interviewed by IA investigators, and that his failure to

---

[2]  In their depositions, various officers refer to *Lybarger* immunity.  This immunity is conferred under *Lybarger v. City of Los Angeles*, 40 Cal.3d 822 (1985), and precludes the use in subsequent criminal proceedings of statements coerced or compelled from a public employee under threat of dismissal during an administrative hearing.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   adequately handle or document Amaro's complaint of pain, passed on to him by some officer,

2   could easily be considered contributory to his death" (*id*. at 27–28).

3          Notably, the IA investigation was only directed at "[u]ntruthfulness concerning a death in

4   custody investigation," and *not* on whether excessive force had actually been used by the officers

5   or whether Amaro had died as a result of excessive force (Chanin Decl. Exh. 42 at 1; Rachael

6   Dep. 98–100).  That said, the IA report noted that Dr. Van Meter, who performed the autopsy on

7   Amaro, told IA investigators that Amaro's rib injuries were "not consistent with a blow and more

8   likely resulted from falling to the ground" (*id.* at 25).[3]  Additionally, according to Lieutenant

9   Berlin, the decision by Chief Word to debrief the District Attorney's office before the IA

10  investigation was completed was because the Mirandized statements from the police officers were

11  "locked," and any evidence from the IA investigation that officers had changed their story could

12  not be used by homicide investigators and the District Attorney's office to determine if there was

13  evidence of excessive force (Berlin Dep. 138–139).  As such, the IA report was never presented

14  to the District Attorney's office for reconsideration of whether charges should be filed or whether

15  the homicide investigation should be reopened.

16         Geraldine Montoya was never informed about the outcome of either the homicide or IA

17  investigation, and no efforts were made to do so (G. Montoya Decl. Exh. A; Rachael Dep. 84).

18  According to Lieutenant Berlin, the protocol at the time of Amaro's death was that the Coroner's

19  Office — not the Oakland Police Department — would notify a victim's family if foul play was

20  suspected in the victim's death (Berlin Dep. 44).  Chief Word, when asked if there was any policy

21  or practice in 2000 about informing relatives of victims involved in an in-custody death

22  investigation about the outcome of that investigation, stated that he "kn[e]w of no such policy"

23  and "couldn't speak to the practice at homicide," but that "there may have been a practice" and

24  "[c]ertainly in the more typical Oakland homicide, [investigators] maintain contact with family

25  members" (Word Dep. 89).  This was because family members were "often a key source of

26  information" (*ibid.*).  When prompted if there was any other reason why family members would

27

28         [3]  As cited earlier in this order, Dr. Van Meter's sworn deposition, as well as
statements made to Sergeant Galindo, are inconsistent with the opinion attributed to her in
the IA report.

United States District Court

For the Northern District of California

1    be, as Word put it, "consulted and kept informed as to the status of the investigation," he simply

2    answered "[r]espect" (*ibid.*).

3         As for informing family members of IA investigations, Captain Anthony Rachal testified

4    that if a member of the public told the Oakland Police Department in 2000 that police officers had

5    beaten up a family member, the allegation would "more than likely" be treated as a complaint of

6    misconduct against the police department and investigated by Internal Affairs (Rachal Dep.

7    84–87).  The complainant would then receive a letter summarizing the allegations as well as the

8    results of the IA investigation (*id.* at 84).  Chief Word confirmed that this policy or practice of

9    informing complainants of the results of IA investigations existed in 2000 (Word Dep. 90–91).

10   Additionally, when asked "[i]f a family member told a police officer that they had information

11   that the police beat their son and he died as a result, would that be considered a complaint," Chief

12   Word responded "I would think so" because "it's an allegation" that "[i]f proven true [would be]

13   a violation of policy of law" (*id.* at 91).

14        Montoya's documented complaint to Sergeant Galindo on April 21 that her son's injuries

15   were caused by Oakland police officers was not treated as an IA complaint, and therefore no

16   complaint of Amaro's alleged beating was filed with Internal Affairs.  Because the IA

17   investigation that did occur was initiated from within the Oakland Police Department, Amaro's

18   family — under policy and practice at the time — did not receive notice of it (Rachal Dep. 84–87;

19   Word Dep. 90–91).  In sum, aside from being told by Sergeant Galindo on April 21, 2000, that

20   her son was killed by gang members or drugs, plaintiff Geraldine Montoya received no

21   information regarding the death of her son from the Oakland Police Department, even though she

22   asked for police and autopsy reports from the police department soon after her son's death.

23   Montoya's only indication from Oakland police that something might have been improper

24   regarding the death of her son was that an investigation was occurring, and a statement to her

25   made by a pathologist at the police station that "there's apparently something here" with the

26   investigation that "nobody's going to give away" (G. Montoya Dep. 154).[4]

27

28        ───────────────────
          [4] This statement was apparently made when Montoya attempted to meet with
     Sergeant Galindo in person during the week following Amaro's death.

United States District Court

For the Northern District of California

1    Following Amaro's death, his family put up posters throughout the neighborhood seeking

2  information about the March 23 arrest (*id.* at 156–57, 160).  The posters stated that Amaro had

3  been arrested on March 23, 2000, that he had been beaten by "6 task force officers," and that he

4  had sustained numerous broken ribs as a result of the beating but had been refused medical

5  attention while in jail (Chanin Decl. Exh. 5).  During this time period, Geraldine Montoya also

6  approached approximately five Oakland attorneys — including her current counsel, John Burris

7  — to pursue her son's claim (G. Montoya Dep. 152).  At that time, she had not found any

8  witnesses to the arrest of her son, and had received no police or autopsy reports corroborating her

9  son's claim (G. Montoya Decl. Exh. A ¶¶ 11, 12).  No lawyer was willing to take her case without

10  corroboration of Amaro's claims, especially given the fact that Sergeant Galindo had informed

11  Montoya that her son's death was caused by gang activity or drug use (G. Montoya Dep.

12  152–153; G. Montoya Decl. Exh. A ¶ 11).[5]

13    On September 13, 2000, Geraldine Montoya filed a government claim against the City of

14  Oakland, based solely upon her son's allegations of excessive force during his March 23 arrest

15  (G. Montoya Dep. 144–147; Rowell Decl. Exh. 6).  While this claim was filed in *pro per*, her

16  current counsel — Attorney John Burris — assisted Montoya in putting the document together

17  (G. Montoya Dep. 146).  According to Montoya, this claim was filed in order to preserve her right

18  to bring a claim under state law while she continued to try to uncover evidence to corroborate her

19  son's claims (G. Montoya Decl. Exh. A ¶¶ 13, 14).  The government claim was brought on behalf

20  of "the Estate of Jerry Amaro III and Geraldine Montoya" and asserted that Amaro was subjected

21  to excessive force during the course of his arrest on March 23, 2000 (Rowell Decl. Exh. 6).  It

22  further alleged that Amaro complained of pain while incarcerated and that authorities failed to

23  provide him with medical treatment, and that Amaro died as a result of the excessive force (*ibid.*).

24  The claim sought damages for the violation of Amaro's constitutional and civil rights and failure

25  to provide medical care, as well as loss of support, society, and comfort on behalf of Geraldine

26

27

28    [5] As the IA report and depositions indicate, Timothy Murphy and Theresa Batts, both witnesses to the arrest of Amaro, actually saw the fliers put up in the neighborhood by Amaro's family, but chose not to contact plaintiffs (Chanin Decl. Exh. 9; Batts Dep. 31).

United States District Court

For the Northern District of California

1    Montoya (*ibid.*).  Montoya does not recall ever receiving a formal rejection of the claim (*id.* ¶ 13).

2

3        After filing this government claim, Montoya attempted one last time to obtain a copy of

4    police reports concerning her son's arrest and subsequent death in November 2000 (*id.* ¶ 15;

5    Chanin Decl. Exh. 74).  While both the homicide and IA investigations had long since concluded,

6    her written request was denied because there was an "outstanding warrant" for her son, who all

7    concerned knew was dead (Chanin Decl. Exh. 74).

8                        *               *               *

9        More than eight years then passed.  In January 2009, news reports surfaced that the FBI

10   had begun an investigation into defendant Poulson based upon allegations involving the March 23

11   arrest and subsequent death of Amaro (*ibid.*; Chanin Decl. Exh. 68).[6]  The FBI — according to

12   these news reports — had received tips that Poulson had "kicked" Amaro during the arrest,

13   thereby breaking his ribs, but had covered it up by instructing subordinate officers to lie (Chanin

14   Decl. Exh. 55).  Attorney Burris filed the instant action on March 2009, after the above-

15   mentioned news reports purportedly provided "facts sufficient to commence litigation" (Opp. 14).

16       Shortly thereafter, defendants moved to dismiss plaintiffs' claims as time-barred under the

17   applicable one-year statute of limitations (Dkt. No. 17).  The motion was denied, since plaintiffs

18   had shown "a plausible factual basis for their argument" of equitable estoppel (Dkt. No. 32).

19   Discovery then proceeded on all issues, leading to the instant motion.

20                                **ANALYSIS**

21       Summary judgment is granted under Rule 56 when "the pleadings, the discovery and

22   disclosure materials on file, and any affidavits show that there is no genuine issue as to any

23   material fact and that the movant is entitled to judgment as a matter of law."  A district court must

24   determine, viewing the evidence in a light most favorable to the nonmoving party, whether there

25   is any genuine issue of material fact.  *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865,

26

27          [6]  Defendants' objections to Exhibit 68 are overruled.  The news article cited is not
     being offered for the truth of the matters asserted, but rather for their effect on plaintiffs'
28   decision to file this lawsuit.  All other evidentiary objections raised by defendants are denied
     as moot, since they are not relied upon or cited by this order.

**United States District Court**
For the Northern District of California

872 (9th Cir.2007).  A genuine issue of fact is one that could reasonably be resolved, based on the

factual record, in favor of either party.  A dispute is "material," however, only if it could affect

the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248–49 (1986).

Defendants' instant motion is made on the following grounds: (1) as to all plaintiffs and

causes of action, all claims are barred by the statute of limitations; (2) as to plaintiff Stephanie

Montoya (Amaro's sister), she has standing only with respect to her equal protection claim; (3)

there is no merit to plaintiffs' equal protection claims; and (4) as to plaintiffs' substantive due

process claims, defendants are entitled to judgment as a matter of law because there is no

evidence of any intent on the part of any defendant to interfere with plaintiffs' familial

relationships (Br. 1).  There arguments are now addressed in turn.

**1.   STATUTE OF LIMITATIONS**

The limitations period in this action ran long ago.  As such, plaintiffs' right to bring their

claims depends upon the applicability of equitable estoppel.

Equitable estoppel, also referred to as fraudulent concealment, "focuses primarily on the

actions taken by the defendant in preventing a plaintiff from filing suit . . . [including] the

plaintiff's actual and reasonable reliance on the defendant's conduct or representations."  *Santa*

*Maria v. Pac. Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000).  In federal civil rights actions, such as

the one brought by plaintiffs here, California equitable estoppel law applies to the extent it is not

inconsistent with federal law.  *Azer v. Connell*, 306 F.3d 930, 936 (9th Cir. 2002).  Under

California law, plaintiff carries the burden of pleading and proving the following elements of

equitable estoppel:

> (1) the party to be estopped must be apprised of the facts; (2) that
> party must intend that his or her conduct be acted on, or must so
> act that the party asserting the estoppel had a right to believe it was
> so intended; (3) the party asserting the estoppel must be ignorant
> of the true state of facts; and (4) the party asserting the estoppel
> must reasonably rely on the conduct to his or her injury.

*Honig v. San Francisco Planning Dep't*, 127 Cal.App.4th 520, 529 (2005).  This rule is "similar

to and not inconsistent" with federal law, as both "focus on actions taken by the defendant which

prevent the plaintiff from filing on time."  *Lukovsky v. City and County of San Francisco*, 535

F.3d 1044, 1052 (9th Cir. 2008); *see also Santa Maria*, 202 F.3d at 1176 (setting forth the federal rule for equitable estoppel and noting that courts must also consider "the extent to which the purposes of the limitations period have been satisfied").

This order has put forth a rich factual record to illustrate the full scope of activity on both sides of this dispute during the period immediately following Jerry Amaro's arrest and death. Defendants, however, would deem the vast majority of these facts irrelevant. Indeed, in their opening brief, defendants rely solely upon evidence that plaintiff Geraldine Montoya believed and had evidence prior to and after her son's death that he had been beaten by Oakland police and had been refused medical treatment to prove that equitable estoppel should not apply (Br. 3).

Specifically, defendants highlight the following five undisputed facts: (1) plaintiff Geraldine Montoya had been told by her son that he had been beaten and had been refused medical treatment by Oakland police officers; (2) she had (or believed she had) in her possession a note from Amaro's physician, given to her by her son, that stated that her son's broken ribs and collapsed lung were caused by Oakland police; (3) she helped her family put up posters around the neighborhood after her son's death that demonstrated knowledge of the facts underlying her claims; (4) she approached attorneys in 2000 to file a claim on behalf of her son; and (5) she actually filed a government claim in September 2000 that included nearly the same claims as in the instant action.

This proves, according to defendants, that plaintiff Geraldine Montoya had in her possession a sufficient factual basis to file the instant litigation, and uncover — through the use of discovery — all the information that plaintiffs' believed had been fraudulently concealed by the Oakland Police Department. Moreover, these facts also prove, according to defendants, that Geraldine Montoya could not have reasonably relied upon Sergeant Galindo's representations that Amaro had been killed by gang members or drugs. As such, defendants argue that under *Gibson v. United States*, 781 F.2d 1334, 1345 (9th Cir. 1986), the doctrine of equitable estoppel cannot apply (Br. 8–15).

In *Gibson*, the plaintiffs alleged that the FBI had conspired to confiscate documents from their garage, and then burn it down to cover its misdeeds. 781 F.2d at 1343. They alleged further

United States District Court
For the Northern District of California

14

1   that the FBI attempted to hide its complicity by filing a concocted account of the incident with the

2   Los Angeles fire department. *Id.* at 1344. The Ninth Circuit rejected the plaintiffs' equitable

3   estoppel claim, holding that the plaintiffs could not reasonably have relied on the allegedly

4   fraudulent representation because an incendiary device was discovered immediately after the fire.

5   Thus, plaintiffs *knew* that the fire was not accidentally ignited. Additionally, plaintiffs failed to

6   allege that they undertook diligent efforts within the limitations period to identify the source of

7   the fire. *Id.* at 1345. As such, equitable estoppel could not apply.

8        Defendants then conclude their argument by characterizing plaintiffs' equitable estoppel

9   claim as "little more than the assertion that the police officers told a story that was different from

10  what Mr. Amaro told his mother," cautioning that "if denial of liability and a contrary version of

11  the facts is enough to show fraudulent concealment, then *every* case would be subject to

12  challenge, and statutes of limitations would have no force and effect" (Br. 15).

13       Plaintiffs' response to defendants' argument is largely unpersuasive. *First*, plaintiffs

14  argue that defendant Poulson's invocation of his Fifth Amendment testimonial privilege should

15  result in the Court drawing "adverse inferences" against him, including that "[d]efendant Poulson

16  actively and fraudulently concealed to what happened to Mr. Amaro" (Opp. 16–17). This

17  argument, however, ignores equitable estoppel's requirement of reasonable reliance, since there is

18  no evidence in the record that plaintiffs relied, or could have relied, on any actions taken by

19  Poulson. *Second*, both parties argue over whether Geraldine Montoya could have filed her suit

20  within the limitations period under Rules 8 and 11 of the Federal Rules of Civil Procedure, and

21  the pre-*Iqbal* world of notice pleading (Br. 13; Opp. 17–22).

22       The doctrine of equitable estoppel, however, does not turn on ebb and flow of federal

23  pleading standards.[7] Rather, it is built upon a "foundation of conscience and fair dealing" and the

24  —————————————————

25       [7] This order rejects counsel's theory that, under Rule 11, there was insufficient
    evidence to file a Section 1983 action against the police. Even under *Iqbal*, if a son or
26  daughter tells a parent that the police used excessive force to beat the child, shows the parent
    the bruises, tells the parent that the police denied requested medical attention while in
27  custody, seeks a doctor's aid upon release, and then dies from the injuries sustained, the
    parent, as a plaintiff, has enough to satisfy Rule 11 — as does the parent's lawyer. The
28  lawyer may desire stronger evidence as a matter of identifying stronger cases, but even
    without additional evidence, a parent's first-hand knowledge of what the decedent child had

United States District Court

For the Northern District of California

1    tenet that "no man may profit from his own wrongdoing in a court of justice." *Lantzy v. Centex*

2    *Homes*, 31 Cal.4th 363, 383 (2003); *City of Long Beach v. Mansell*, 3 Cal.3d 462, 488 (1970).

3         In light of these principles, *Gibson* does not bar the application of equitable estoppel to

4    this case.  While it is clear Geraldine Montoya, as the victim's mother, believed her son's

5    allegations that he had been beaten by police officers and had been denied medical treatment prior

6    to and after his death, she had no evidence to support this claim other than his allegations, the fact

7    that he had been injured, and a "piece of paper" supposedly from Amaro's examining physician,

8    Dr. Green, that he had been beaten by police.[8]  This falls far short of the literal smoking gun

9    discovered by plaintiffs in *Gibson* — namely, the incendiary device that provided compelling

10   proof that arson had been committed.  781 F.2d at 1345.

11        Troubling to the Court's conscience and sense of fair dealing is that Geraldine Montoya

12   and Amaro's family diligently tried to obtain evidence to corroborate their suspicions.  Montoya

13   approached the Oakland police department *three separate times* — the final attempt being nearly

14   eight months after her son's March 23 arrest — to try to obtain documents pertaining to her son's

15   arrest and death.  All attempts were rebuffed.  Fliers were put up in the community.  No witnesses

16   came forward.  Legal advice was solicited from at least five attorneys.  Each told Montoya that

17   she needed something tangible, like documentation, to bring a worthwhile civil rights claim

18   against the City of Oakland and the Oakland Police Department.  On top of all this, Montoya even

19   filed a government claim to diligently attempt to preserve her claim.[9]  As such, it is clear that

20   unlike the plaintiffs in *Gibson*, Geraldine Montoya *did* exercise diligence in trying to preserve her

21   claims.

22        Most troubling of all, however, is that the Oakland Police Department affirmatively

23   misled the Montoyas as to what had occurred.  Geraldine and Lou Montoya told Sergeant Galindo

24   _____

     said is enough to satisfy Rule 11.

25

26        [8]  As mentioned earlier, the "piece of paper" was likely a copy of the medical report
     for Amaro's examination by Dr. Green that merely repeated Amaro's allegations that he had
     been beaten by police (Green Dep. 13).

27

28        [9]  Filing such a claim does not bar applicability of equitable tolling.  *See UA Local
     343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465 (9th Cir. 1994) (holding that equitable estoppel
     applied even though plaintiff had filed an earlier NLRB charge against defendant).

United States District Court

For the Northern District of California

of Amaro's allegations of being beaten by Oakland police officers and having been refused

medical treatment.  Sergeant Galindo replied that Amaro's injuries were caused by gang violence,

and that their son had been involved in a drug-related murder by gang members.  He knew this

was not the truth, or so a reasonable jury could conclude.  Galindo never revealed to the

Montoyas that there was *any* evidence supporting their allegations, despite knowing otherwise.

Also troubling is the fact that Sergeant Galindo noted the Montoyas allegations of

excessive (or at least questionable) force in his homicide log, but failed to submit a formal

complaint to the Internal Affairs department regarding the alleged police misconduct.  The record

supports a finding that it was practice, if not procedure, in 2000 for Oakland police officers to

report such complaints to Internal Affairs for further investigation.  Had such a complaint been

filed, the Montoyas would have received a written report summarizing the findings of the IA

investigation into those allegations, and could have used this information to file this action.  And

why wasn't the victim's family kept informed as to the status of the homicide investigation into

the death *of their own son*, which Police Chief Word said was common practice for typical

Oakland homicide investigations?  Had the victim's family been apprised of the investigation,

they might have learned of the *numerous* witnesses who had provided statements to police, or at

the very least, the suspicious results of their son's autopsy report.  Any one of these sources of

information could have corrected the affirmative misrepresentations made by Officer Galindo to

the victim's family.

Instead, plaintiff Geraldine Montoya was stonewalled in every attempt she made — within

the limitations period, this order adds — to obtain evidence to corroborate her deceased son's

allegations, and disprove the false story told by Sergeant Galindo.  On this point, the undersigned

acknowledges that records of ongoing criminal investigations are (and were, at the time of these

events) exempt from disclosure under the Public Records Act.  *See* Cal. Gov. Code § 6254(f); *see*

*also Williams v. Superior Court*, 5 Cal.4th 337, 348–350 (1993).  This exemption, however, was

far from absolute.  While police had the right to withhold the police reports themselves, Section

6254(f) required police to disclose certain *information* within those records — such as "the names

and addresses . . . [and] statements of all witnesses, other than confidential informants, to the

**United States District Court**

For the Northern District of California

victims of an incident, or an authorized representative thereof" as well as "the factual
circumstances surrounding the arrest" of "every individual arrested by the agency."  Cal. Gov.
Code §§ 6254(f), (f)(1).  The only statutory exception to this requirement is if the disclosure of
such information would have "endanger[ed] the safety of a witness" or "the successful completion
of the investigation[.]"  *Ibid*.  Here, there is no evidence that any of the witnesses to Amaro's
beating would have been endangered by such a disclosure.  Moreover, the only threat to the
police's "successful completion of the investigation" was the possibility that plaintiffs would
have filed a timely suit.  Finally, Geraldine Montoya's written request for her son's police reports
in November 2000 was months after all investigations into her son's death had ended.  As such,
"the successful completion of [any] investigation" could not have been endangered by disclosure,
and the information and records should have been made available to her.  This order also notes
that the reason given for the November 2000 denial — that her dead son had an "outstanding
warrant" — was ridiculous at best and more likely part of a cover-up.  Had these police and
autopsy reports been made available to Ms. Montoya, it is a reasonable inference that plaintiffs
would have had sufficient documentation to bring their suit within the limitations period.

Instead, plaintiffs reasonably relied upon the Oakland Police Department to hear their
allegations of misconduct and act upon them.  "In performing their official functions, government
officers and employees owe unique duties of loyalty, trust, and candor to their employers, *and to
the public at large*."  *Spielbauer v. County of Santa Clara*, 45 Cal.4th 704, 725 (2009) (emphasis
added).  Even in the face of troubling allegations concerning the misconduct of one of their own,
law enforcement must continue to be guardians of the peace and seek justice for members of the
public who rely upon them in this capacity.  Indeed, in such a situation, law enforcement is in the
*best* position to look inward, investigate, and uncover the truth.

Here, the Oakland Police Department breached their duties of loyalty, trust, and candor to
plaintiffs.  Jerry Amaro's death was the subject of both a homicide and IA investigation involving
the very allegations of misconduct plaintiffs presented to the police.  Despite this fact, the *only*
information police provided to the victim's family was the false story that Amaro had been beaten
and killed by gang members due to drug involvement.  Even if this affirmative misrepresentation

18

United States District Court

For the Northern District of California

had not been made by Sergeant Galindo, Oakland police knew *within hours* of investigating Amaro's death that plaintiffs' allegations had supporting evidence, and either should have instigated an IA investigation on plaintiffs' behalf or kept Amaro's family apprised of the status of the homicide investigation.  Neither happened here.  Every time Geraldine Montoya diligently tried to obtain information from the police department, she met a stonewall.  Under these facts, this order finds that the defendants had an affirmative duty to correct the false statements made to the victim's family, file an IA claim based upon the Montoyas' allegations of excessive force, or keep the victim's family — who were obviously not suspects in the death of Amaro — apprised of the homicide investigation.  None of these actions were taken.

Given these and all other reasons discussed above, it would not serve the principles of equitable estoppel or the purposes of the limitations period to bar plaintiffs claims in this action. Plaintiffs have, at the very least, provided sufficient evidence to take to the jury the issue of whether under these facts, Sergeant Galindo intended plaintiffs to rely on his statement and not file suit, plaintiffs had a right to believe it was so intended, plaintiffs knew the true state of facts to bring their claim, and plaintiffs' reliance on Sergeant Galindo's statement was reasonable.  As such, defendants' motion seeking to bar plaintiffs' claims under the statute of limitations must be **DENIED.**[10]

### 2.   ISSUES OF STANDING

Defendants separately challenge the standing of both Geraldine Montoya and Stephanie Montoya, the mother and sister of Amaro, to bring equal protection and substantive due process claims against defendants under the Fourteenth Amendment.

*First*, defendants argue that nothing in the record suggests any injury caused by an intent to discriminate against plaintiffs because of their membership in a protected class (Br. 17). Plaintiffs expressly declined to oppose this assertion to "narrow the case for trial" (Opp. 22).  As such, defendants' motion with respect to plaintiffs' equal protection claims is **GRANTED.**

---

[10]  Both parties raised the issue of whether plaintiff Geraldine Montoya's alleged mental incapacity should be considered in determining whether equitable estoppel should apply.  Because this order does not rely on Montoya's mental capacity, neither party's arguments on this issue are addressed.

United States District Court

For the Northern District of California

*Second*, defendants target the substantive due process claims raised by Geraldine and Stephanie Montoya.  With respect to both Montoyas, defendants ask the Court to disregard Ninth Circuit precedent set forth in *Ward v. City of San Jose*, 967 F.2d 280 (9th Cir. 1991), and *Smith v. City of Fontana*, 818 F.2d 1411, 1420 n.12 (9th Cir. 1987), and hold that a substantive due process claim based upon a deprivation of a liberty interest due to interference with familial relations must show *a specific intent to interfere with the familial relation itself* above and beyond an injury to the family member (Br. 18).  To support this good faith argument, defendants cite to numerous decisions from our sister circuits — specifically, the First, Third, Fourth, Sixth, Seventh, Eighth, Tenth, and D.C. Circuits — supporting their proposed rule of law (Br. 18).  Under current Ninth Circuit precedent, however, plaintiffs need only show that the officials were "more than merely negligent" to state such a claim, which the factual record supports.  *Smith v. City of Fontana*, 818 F.2d 1411, 1420 n.12 (9th Cir. 1987).

While the undersigned acknowledges that the prevailing winds on this issue blow in the opposite direction of this circuit's controlling case law, the Ninth Circuit recently reiterated that the standards governing familial relations claims under the Fourteenth Amendment set forth in *City of Fontana* remain applicable.  *See Crowe v. County of San Diego*, — F.3d —, 2010 WL 293758, at *31 (9th Cir. 2010) (citing the familial relations rule in *City of Fontana* with approval).  As such, defendants' motion for summary judgment seeking a good faith departure from Ninth Circuit precedent is **DENIED**.  No evidence of an intent to interfere with the plaintiffs' familial relations is required — at least under current precedent — to maintain a familial relations claims under the Fourteenth Amendment.

*Third*, defendants argue that Stephanie Montoya, as the decedent's sister, lacks standing to assert a familial relations substantive due process claim against defendants under Section 1983.  In Section 1983 actions, the survivors of an individual killed as a result of an officer's alleged excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action.  42 U.S.C. 1988(a); *Moreland v. Las Vegas Metro. Police Dept.*, 159 F.3d 365, 369 (9th Cir. 1998).  Under California Code of Civil Procedure Section 377.30, a survival action may be commenced by a decedent's personal

United States District Court

For the Northern District of California

1    representative or, if none, by the decedent's successor-in interest.  The party seeking to bring a

2    survival action bears the burden of demonstrating that a particular state's law allows for such an

3    action and that she meets the state's requirements.  *Moreland*, 159 F.3d at 369.  Here, the parties

4    agree that Geraldine Montoya is the successor-in-interest under Section 377.30.  Stephanie

5    Montoya, however, is *not* alleged to have standing under Section 377.30 (Compl. ¶ 5; Opp. 24).

6    As such, she is not authorized to bring a survival action for the excessive-force claim.

7            With respect to Stephanie Montoya's substantive due process claim, defendants also assert

8    that she lacks standing to bring her claim.  Under the due process clause, both the parents and

9    children of a person killed by a government officer have standing to assert claims for their own

10   deprivations of liberty arising out of their loss of consortium.  *Moreland*, 159 F.3d at 371; *City of*

11   *Fontana*, 818 F.2d at 1418.  Under *Ward*, however, the Ninth Circuit clearly stated that siblings

12   do *not* have standing to assert such a claim.  967 F.2d at 284.

13           While both parties agree that this is the law, plaintiffs nonetheless argue that Stephanie

14   Montoya has standing to bring her Section 1983 claim under the Fourteenth Amendment based

15   upon California's wrongful death statute, California Code of Civil Procedure Section 377.60,

16   because she was a "dependent" of Amaro and a minor at the time of his death.  In essence,

17   plaintiffs ask the Court to circumvent the rule in *Ward* and treat Stephanie Montoya as a *de facto*

18   child of Amaro under Section 377.60.  This argument is unpersuasive.  While Section 377.60

19   defines the range of individuals who may bring a wrongful death tort claim in California, it does

20   not (and cannot) define the outer bounds of constitutionally recognized liberty interests for

21   substantive due process claims brought under Section 1983.  Indeed, plaintiffs cite to no binding

22   or persuasive case law supporting a departure from the clear rule set forth in *Ward*.

23           As such, this order declines to extend standing to Stephanie Montoya to bring her

24   substantive due process claims as the sibling of Jerry Amaro, and defendants' motion on this issue

25   is **GRANTED**.  Because this finding is not based upon "technical pleading issues," plaintiffs'

26   request for leave to amend their complaint on this issue is **DENIED**.  Stephanie Montoya does not

27   have standing to bring any of her claims in this action.

28

21

**United States District Court**
For the Northern District of California

**3.     CERTIFICATION UNDER 28 U.S.C. 1292(B)**

The undersigned district judge is of the opinion that (1) this order involves a controlling question of law as to which there is a substantial ground for differences of opinion, namely whether the doctrine of equitable estoppel should apply where a plaintiff believes she has a Section 1983 claim but is dissuaded from bringing the claim by affirmative misrepresentations and stonewalling by the police, and (2) an immediate appeal from this order may materially advance the ultimate termination of the litigation, especially since a different outcome in the court of appeals would end the litigation.  The undersigned therefore certifies the question for interlocutory appeal under 28 U.S.C. 1292(b).  Defendants have **TEN DAYS** to apply to the court of appeals to permit an appeal.  If such an application is timely made, the impending trial and final preparations therefor will be postponed.

**CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment pertaining to plaintiffs' equal protection claims and all claims brought by Stephanie Montoya is **GRANTED**. The motion with respect to all remaining issues is **DENIED**.


**IT IS SO ORDERED.**


Dated: February 23, 2010.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

22